**UNITED STATES of America**

v.

**Michael LAMB, Defendant.**

No. 95–CR–399.

United States District Court,
N.D. New York.

Nov. 5, 1996.

transmission, and possession of computer images of child pornography. The government and defendant consented to the court deciding these motions on submission. Doc. 33. The following constitutes the court's memorandum-decision and order in this matter.

## I. BACKGROUND

Defendant is charged in the first superseding indictment, Doc. 30, with twenty-three counts of receiving by computer transmission sexually explicit images of children, in violation of 18 U.S.C. § 2252(a)(2). Counts 24–48 accuse defendant of sending such images by computer, in violation of 18 U.S.C. § 2252(a)(1). Count 49 charges him with possession of three or more visual images of child pornography, punishable under 18 U.S.C. § 2252(a)(4). Finally, the government seeks forfeiture of defendant's computer system.

This prosecution is the product of a comprehensive operation conducted by the Federal Bureau of Investigation known as "Innocent Images." The interest of federal law enforcement officers in the flow of child pornography over the Internet was evidently piqued by the much-publicized case involving the abduction of a ten-year old Maryland boy. *See* Ex. E att'd to Def.'s Notice of Motion, Doc. 22, at 10–11. Bureau agents investigating the matter discovered that computer on-line services were being used to entice children into sexual encounters with adults, and that child pornography was being distributed regularly by computer. The Baltimore office of the FBI subsequently spearheaded an investigation wherein law enforcement agents would sign on to computer services and attempt to identify traffickers of image files containing child pornography.

Evidence against defendant in the case at bar originated from the Florida Department of Law Enforcement. Ex. F att'd to Def.'s Notice of Motion, Doc. 22, at 14–17. A special agent of that department and a confidential informant signed on to the America OnLine service ("AOL") in an undercover capacity and obtained image files depicting children engaged in explicit sexual conduct.

Thomas J. Maroney, United States Attorney, Northern District of New York, Syracuse, NY, for U.S.; Elizabeth S. Riker, Assistant U.S. Attorney, of counsel.

Lewis and Fiore, New York City, for Defendant; David L. Lewis, of counsel.

### MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

Now before the court are omnibus pretrial motions in this case concerning the receipt,

An individual using the screen names[1] "Josh6979" and "JoMi15" was involved in the receipt and transmission of over 100 child pornography images between August 1, 1994 and April 9, 1995. The individual's AOL account number was also learned.

A federal grand jury issued a subpoena to AOL's headquarters in Virginia to discover information about the subscriber corresponding to that account number and to the pertinent screen names. On March 30, 1995 AOL identified the subscriber as the defendant. *Id.* at 17. Further investigation confirmed that a computer equipped with a modem was located in defendant's home in Marcellus, New York. *Id.* at 18–20.

On September 13, 1996 federal agents executed search warrants at 125 homes and businesses in furtherance of Innocent Images. One home searched was Michael Lamb's. During the execution of the search he was interviewed. Defendant made potentially incriminating statements and wrote out and signed a statement. *See* Ex. A att'd to Def.'s Notice of Motion, Doc. 22. A search of the hard drive on defendant's computer revealed that it contained many child pornography image files. Adult pornographic materials were also found at defendant's house, along with marijuana. Defendant was later indicted and arrested.

## II. DISCUSSION

Defendant seeks *omnibus pretrial relief* in the following particulars: dismissal of the indictment on the grounds that the statute at issue is unconstitutionally overbroad, is overbroad as applied, is void for vagueness, and violates principles of substantive and procedural due process; motion for a pretrial evidentiary hearing to determine whether the images in the indictment are of actual children; suppression of evidence seized pursuant to the warrant executed to search AOL's Virginia offices; suppression of evidence seized pursuant to the warranted search of his home; dismissal of counts 6, 9, and 32 as impossible; exclusion of adult pornography from being offered at trial; exclusion of the

use of prior bad acts at trial; discovery of the government's role in the transmission and creation of the images at issue; individually sequestered voir dire; exclusion of any contemplated expert testimony on pedophilia; disclosure of any Federal Rule of Evidence 404 or 609 material the government intends to introduce at trial; and dismissal of the indictment based on the government's "outrageous conduct." Defendant has withdrawn his motion to suppress his statements to the FBI as violative of the Fifth Amendment. However, he has also moved to exclude the statements as a fruit of the allegedly unconstitutional search of his home. The government cross-moves for reciprocal discovery. The requested relief is discussed below.

### A. Constitutionality of Statute

Any facial challenge to a statute must naturally begin with the language of the law itself:

(a) Any person who—

(1) knowingly transports or ships in interstate or foreign commerce by any means including by computer or mails, any visual depiction, if—

(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

(2) knowingly receives, or distributes, any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution in interstate or foreign commerce by any means including by computer or through the mails, if—

(A) the producing of such visual depiction involves the use of a minor

---

**1.** A screen name is an alias used by subscribers to computer services. *See* Ex. E att'd to Def.'s Notice of Motion, Doc. 22, at 15 n. 2. The use of screen names is commonplace, and not limited to those engaged in illicit activities.

engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;

[or]

(4) . . .

(B) knowingly possesses 3 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if—

(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(ii) such visual depiction is of such conduct;

shall be punished as provided in subsection (b) of this section.

18 U.S.C. § 2252(a)(1), (2), & (4)(B).

Defendant challenges the statute he is charged under as unconstitutionally overbroad and vague. As these arguments are legally intertwined, the court treats them together. *See Local 189 Int'l Union of Police Ass'ns v. Barrett*, 524 F.Supp. 760, 765 (N.D.Ga.1981). The court then briefly addresses defendant's claim that the rule in *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) permits an individual to possess child pornography in the privacy of his home. The substantive and procedural due process challenges to the statute are addressed at the end of this section.

*1. Overbreadth and Vagueness*

■ A statute is overbroad under the First Amendment when in addition to proscribing activities which may properly be forbidden, it also sweeps within its coverage activity protected by the guarantee of free speech. *E.g., Cantwell v. Connecticut*, 310 U.S. 296, 304, 60 S.Ct. 900, 903–04, 84 L.Ed. 1213 (1940); *Thornhill v. Alabama*, 310 U.S. 88, 97–98, 60 S.Ct. 736, 741–742, 84 L.Ed. 1093 (1940). The overbreadth doctrine is powerful in free expression cases, as the movant need not demonstrate that his or her conduct was protected, as long as the court is persuaded that the statute infringes upon an unacceptable level of activity privileged under the First Amendment. *See Kunz v. New York*, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951). Only a statute that is substantially or facially overbroad however will be struck in its entirety. *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917–18, 37 L.Ed.2d 830 (1973). Defendant contends that the statute in question strikes indiscriminately at categories of expression that cannot be punished consonant with the First Amendment.

■ Defendant also raises the related doctrine of vagueness. A statute will be held void for vagueness if the proscribed activity is so unclearly defined that persons of common intelligence must necessarily guess at it meaning and differ as to its application. *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926). Laws that are overbroad and/or vague share common vices. First, the essentially unfettered discretion granted to police officers in applying them leads to selective enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 358, 103 S.Ct. 1855, 1858–59, 75 L.Ed.2d 903 (1983) (vagueness; statute struck because it vested "virtually complete discretion" in the police); *Kunz*, 340 U.S. at 295, 71 S.Ct. at 315–16 (overbreadth; "no appropriate standards" to guide officials). Second, uncertainty as to just what is prohibited chills the speech rights of the citizenry. *See Arnett v. Kennedy*, 416 U.S. 134, 231, 94 S.Ct. 1633, 1682, 40 L.Ed.2d 15 (1973) (Marshall, J., dissenting) (overbreadth)[2]; John E. Nowak & Ronald D. Rotunda, Constitutional Law § 16.9, at 1001 (5th ed. 1995) (vagueness). This is so because "[w]hen one must

---

**2.** Justice Marshall opined that overbroad statutes hang over the public's heads "like a sword of Damocles.... That this court will ultimately vindicate [a person] if his speech is constitutionally protected is of little consequence—for the value of a sword of Damocles is that it hangs—not that it drops." *Id.*

guess what conduct or utterances may lose him his position, one necessarily will 'steer far wider of the unlawful zone.'" *Keyishian v. Board of Regents,* 385 U.S. 589, 603–04, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967) (quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)). In the instant matter, defendant argues that the definition of the prohibited materials, that is, visual depictions involving the use of minors engaging in sexually explicit conduct, is too vague for the statute to stand.

This court finds *New York v. Ferber,* 458 U.S. 747, 773, 102 S.Ct. 3348, 3363, 73 L.Ed.2d 1113 (1982), to be determinative of defendant's facial challenge. The Supreme Court in that case upheld New York State's child pornography law against an overbreadth argument. *Id.* at 766–74, 102 S.Ct. at 3359–64. Justice White writing for the majority considered *Ferber* "the paradigmatic case of a … statute whose legitimate reach dwarfs its arguably impermissible applications." *Id.* at 773, 102 S.Ct. at 3363. Situations in which the statute would quash forms of expression with serious literary, artistic, or scientific merit were predicted to "amount to no more that a tiny fraction of the materials within the statute's reach." *Id.*

The New York statute is not different from the federal statute in any way relevant to the overbreadth argument. For instance, the definition of sexually explicit conduct at 18 U.S.C. § 2256(2) is virtually indistinguishable from the definition of sexual conduct at New York Penal Law § 263.00(6), as demonstrated more fully infra. And the number of courts that have upheld the various provisions of the Protection of Children Against Sexual Exploitation Act of 1977, 92 Stat. 7 (codified as amended at 18 U.S.C. §§ 2251–2259) against overbreadth arguments—most of them with reference to *Ferber*—is growing. *E.g., United States v. Knox,* 32 F.3d 733, 751–52 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995); *United States v. X–Citement Video, Inc.,* 982 F.2d 1285, 1287–89 (9th Cir.1992), *rev'd on other grounds,* —— U.S. ——, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); *American Library Ass'n v. Barr,* 956 F.2d 1178, 1190 (D.C.Cir.1992); *United States v. Wolf,* 890 F.2d 241, 246 (10th Cir.1989); *United States v. Reedy,* 845 F.2d 239, 241 (10th Cir.1988) (ruling in *Ferber* "not distinguishable" from challenge to federal statute), *cert. denied,* 489 U.S. 1055, 109 S.Ct. 1318, 103 L.Ed.2d 587 (1989); *United States v. Rubio,* 834 F.2d 442, 452 (5th Cir.1987) (New York statute "equivalent" to federal statute); *United States v. Smith,* 795 F.2d 841, 848 n. 7 (9th Cir.1986) (federal statute "almost identical" to New York law approved in *Ferber* ), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987); *United States v. Langford,* 688 F.2d 1088, 1092 (7th Cir.1982), *cert. denied,* 461 U.S. 959, 103 S.Ct. 2433, 77 L.Ed.2d 1319 (1983); *United States v. Long,* 831 F.Supp. 582, 586–87 (W.D.Ky.1993); *United States v. Tolczeki,* 614 F.Supp. 1424, 1429–30 (N.D. & E.D.Ohio 1985); *United States v. Andersson,* 610 F.Supp. 246, 249 (N.D.Ind.1985) (New York statute "very similar" to federal law), *aff'd,* 803 F.2d 903 (7th Cir.1986), *cert. denied,* 479 U.S. 1069, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *United States v. Maday,* No. 88–CR–145E, 1989 WL 103666, at *2 (W.D.N.Y. Sept. 6, 1989). Add this court to the list.

In support of his argument that the law reaches conduct that cannot constitutionally be proscribed, defendant observes that the statute fails to make explicit exceptions for possession of child pornography by law enforcement officers, prosecutors, the court, or a jury. The argument is specious for two reasons. Obviously, neither the court nor a juror is subject to prosecution for possession of contraband if it is being examined as evidence at trial, and it is a sophistry to suggest that because possession of contraband is illegal, a law enforcement officer may not seize it or an assistant U.S. attorney may not present it as evidence in a prosecution. But these privileges do not arise from any of the protections of expression embodied in the First Amendment. They are rather incidents of the special functions these persons perform in our justice system. Therefore, defendant—who is not a judge, juror, prosecutor, or law enforcer—may not take advantage of the liberal standing rules accorded free speech overbreadth cases. *See Ferber,* 458 U.S. at 767, 102 S.Ct. at 3359–60 ("The traditional rule is that a person to whom a

statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the court."). And secondly, defendant has failed to show how the omission of explicit exceptions for the types of persons enumerated results in any *substantial* overbreadth. The court rejects the inconceivable notion that the number of times the government will seek to prosecute a juror for possessing in the jury room child pornography that has been admitted into evidence during a child pornography case will amount to any more than an infinitesimal fraction of all child pornography cases, if indeed it ever happens.

■ Defendant also raises the contention that the federal law is unconstitutionally overbroad because it does not explicitly except materials with serious literary, artistic, scientific, or educational value from its sweep. However, the availability of an unconstitutional-as-applied defense substitutes for the lack of these express affirmative defenses. It is true that Justice O'Connor's concurrence in *Ferber* suggested that the First Amendment does not protect even materials with the above-mentioned redeeming attributes. *Id.* at 774–75, 102 S.Ct. at 3363–64. But the concurrences of Justices Brennan, Marshall, and Stevens all maintained that materials otherwise proscribed by the law that have serious literary, artistic, scientific, or educational merit are protected by the First Amendment. *Id.* at 776–77, 778, 102 S.Ct. at 3364–65, 3365–66. More importantly, the majority opinion itself states that

> whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied.

458 U.S. at 774, 102 S.Ct. at 3363 (quoting *Broadrick,* 413 U.S. at 615–16, 93 S.Ct. at 2917–18).

At least one reported case holds that the United States may punish persons trafficking in materials covered by the Protection of Children Act that do possess redeeming social and scientific qualities. *Stanley v. Unit-*ed *States,* 932 F.Supp. 418, 420–21 & n. 3 (E.D.N.Y.1996). In so ruling, Senior Judge Turrentine noted that "Congress rejected a proposed affirmative defense for serious literary, artistic, scientific, social or educational value to prosecution under the child pornography laws." *Id.* at 421. For support, the district court then cited to the legislative history accompanying the Child Protection Act of 1984, 98 Stat. 204 (which amended the 1977 Protection of Children Act in light of *Ferber*). However, the *Stanley* opinion neglected to consider the testimony of a Justice Department official contained in the same report on the subject of the affirmative defense:

> Even in the absence of the affirmative defense provided in H.R. 2432, a defendant may take the position that the application of the child pornography statute to his case is unconstitutional and falls within the "tiny fraction of the materials within the statute's reach" which the Court recognized should receive constitutional protection. 458 U.S. at 772–74, 102 S.Ct. at 3363. Thus, the affirmative defense provision (which was not in the New York statute approved in *Ferber*) is unnecessary.

H.R.Rep. No. 536, 98th Cong., 2d Sess. 13 (1983), *reprinted in* 1984 U.S.C.C.A.N. 492, at 504 (testimony of Mark M. Richard, Dep. Ass't Att'y Gen.).

Thus the fact that the affirmative defense was rejected could have just as easily meant that Congress acknowledged that some small amount of material literally covered by the statute was nonetheless protected by the guarantee of free speech, rendering the express defense redundant, or perhaps overly generous compared to what stands behind the First Amendment's aegis. In any event, it is the judiciary's role to survey the frontier of the First Amendment, and this court declines to join the singular opinion of the Eastern District of New York that the unconstitutional-as-applied defense is absolutely unavailable in a federal child pornography prosecution.[3]

**3.** Alternatively, the *Stanley* court rejected the as-applied defense as unconvincing, as it appeared defendant's claim that he was pursuing academic research was a transparent sham. 932 F.Supp. at 421–22.

Possible examples of when such a prosecution would be constitutionally impermissible are contained in the *Ferber* concurrences of Justices O'Connor, 458 U.S. at 775, 102 S.Ct. at 3364 (*National Geographic* photographs of other cultures) and Stevens, *id.* at 778, 102 S.Ct. at 3365–66 (state legislative committee considering child pornography law and group of research scientists studying human behavior). As another example, this court presumes that Special Agent Ken Lanning, who according to the affidavits in the search warrants in this case is an expert in the field of child pornography and pedophilia, could not be subject to prosecution consonant with the First Amendment for violations of this statute, even if he literally transgressed its boundaries in the writing of his book, *Child Pornography and Sex Rings.*[4]

It appears that defendant in this case may well advance the argument that his possession of child pornography was pursuant to research he was undertaking in his capacity as a psychiatrist at the Auburn Correctional Facility. *See* Ex. A att'd to Lewis Aff., Doc. 22, at 3. This as-applied defense must await trial, where the factfinder can evaluate the credibility of defendant's proffered explanation.

■ The court turns now to the vagueness argument. Defendant argues in the first instance that the statute lends itself to arbitrary enforcement by investigators because "[t]he statute criminalizes child photographs of a type and kind dependent upon the prurient sensibilities of law enforcement." Def.'s Mem.Law., Doc. 23, at 6. Moreover, it "does not define the offense well enough to let ordinary people know what is prohibited." *Id.* at 7. To evaluate these arguments, we look to the definitional section of the Protection of Children Act:

(2) "sexually explicit conduct" means actual or simulated—

(A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

(B) bestiality;

(C) masturbation;

(D) sadistic or masochistic abuse; or

(E) lascivious exhibition of the genitals or pubic area of any person;

18 U.S.C. § 2256(2).

Now let us compare the definitional component of the New York statute approved in *Ferber*:

"Sexual conduct" means actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals.

*Ferber*, 458 U.S. at 751, 102 S.Ct. at 3351; *see also* N.Y. Penal Law § 263.00(3) (McKinney 1989) (same).

The High Court in *Ferber* agreed that "the conduct to be prohibited must be adequately defined by the applicable state law, as written or authoritatively construed." 458 U.S. at 764, 102 S.Ct. at 3358. They went on to hold that the New York Penal Law's definition of sexual conduct comports with that principle. *Id.* at 765, 102 S.Ct. at 3358–59. Since the federal statute is notably more specific than New York's, this court cannot hold that the Protection of Children Act fails to adequately tell the citizenry what is outlawed. For the same reason, the federal statute provides ample guidance for law enforcement officers.

■ Lastly, defendant argues that the statute, in prohibiting the trafficking of visual depictions of child pornography "by computer," 18 U.S.C. §§ 2252(a)(1), (a)(2), & (4)(B), is vague in its application to the technology of transmitting image files over AOL. From the affidavits in this matter and its experience with another Innocent Images

---

4. The legislative history accompanying the Protection of Children Act reveals that the Senate relied on the research of Robin Lloyd, who authored a book on boy prostitution. She "documented the existence of over 260 different magazines which depict children engaging in sexually explicit conduct." S.Rep. 438, 95th Cong., 2d Sess. 5 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 43. It is difficult to imagine how a researcher today could catalog so many publications of this sort without running afoul of the child pornography law. The answer is that such activity may be protected by the Constitution.

case, this court understands that computer distribution of child pornography begins with a regular photograph, film, or videotape. A photograph or still from a film or videotape can be scanned or transferred to a computer by a number of technological means, including digital cameras, flatbed scanners, and video capture cards. The images are converted into one of three image file formats, identified by a three-letter suffix following the period after the filename: GIF, JPG, or ZIP.[5] These files can then be transmitted over a modem to other computers. Another program known as a viewer is required to display the image files as actual pictures on the monitor, although viewers may be incorporated into other software.

Defendant argues that the GIF, JPG, and ZIP files are not visual depictions within the meaning of the statute. The definitional section of the Protection of Children Act says of the term "visual depiction" only that it includes "undeveloped film and videotape." 18 U.S.C. § 2256(5). However, the definition does not exclude other media. Obviously, developed photographs would be covered. In fact, this court believes that the explicit reference to media of a type that requires additional steps and equipment before the images they contain can be viewed supports the proposition that Congress intended to sweep the type of transmission at issue here within the ambit of the statute. It is true that the GIF, JPG, and ZIP files are not visual depictions themselves—they are computer data stored on diskettes or other media, requiring software and a computer to view the images within. But videotape is not itself a visual depiction either. Images are recorded magnetically on a reel of plastic tape coated with iron oxide, requiring a videotape player and television set to view them.

The United States Air Force Court of Criminal Appeals addressed a similar challenge in reviewing the case of a colonel convicted by general court-martial of four specifications of service-discrediting conduct. *United States v. Maxwell,* 42 M.J. 568 (A.F.Ct.Crim.App.1995), *review granted,* 44 M.J. 41 (C.A.A.F.1996). One specification alleged violations of 18 U.S.C. § 2252, and another charged violations of the federal obscenity statute, 18 U.S.C. § 1465. *Id.* at 573. The officer had apparently transmitted child pornography over AOL. At the time of the crime, the obscenity statute read in pertinent part:

> Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or distribution, or knowingly travels in interstate commerce, or uses a facility or means of interstate commerce for the purpose of transporting obscene material in interstate or foreign commerce, any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be [fined or imprisoned or both].

18 U.S.C.A. § 1465 historical and statutory notes (Supp.1996).[6] The defendant argued that he was denied the Due Process of Law under the Fifth Amendment because the statute failed to put him on notice that transmitting obscenity by computer could be criminally prosecuted—one of the vices of a vague statute. The military court rejected this argument, holding that

> [t]he use of the terms "transports," "distribution," "picture," "image," and "electrical transcription" leads us to the inescapable conclusion the statute is fully applicable to the activities engaged in by appellant. . . . It is clear Congress intended to stem the transportation of obscene material in interstate commerce regardless of the means used to effect that end.

---

**5.** These file formats are for converting any picture into a transmittable file—not merely pornography. The ZIP format is used to store several pictures in one file.

**6.** When the military court quoted the statute in a footnote, they erroneously referred to the statute as it appeared before it was amended by the Anti–Drug Abuse Act of 1988, Pub.L. 100–690, § 7521(c), 102 Stat. 4181, 4489. *See* 42 M.J. at

42 M.J. at 580.[7]

*Maxwell* was cited with approval in another case under the obscenity statute (before it expressly punished computer transmission, *see supra* note 6). *United States v. Thomas*, 74 F.3d 701 (6th Cir.1996), *pet. for cert. filed*, 64 U.S.L.W. 3839 (1996). The defendants in *Thomas* contended on appeal that the obscenity statute did "not apply to intangible objects like the computer GIF files at issue" in that case, and also that "Congress did not intend to regulate computer transmissions such as those involved" in that matter. *Id.* at 706.

The first argument is particularly relevant for our purposes. Defendants in *Thomas* maintained they could not be prosecuted for modem transmittal of the image files "because transmission of the GIF files at issue ... involved an intangible string of 0's and 1's which became viewable images only after they were decoded by a[ ] ... computer." *Id.* at 706–07. The Sixth Circuit was unconvinced, and criticized defendants for unduly focusing

> on the means by which the GIF files were transferred rather than the fact that the transmissions began with computer-generated images in California and ended with the same computer-generated images in Tennessee. The manner in which the images moved does not affect their ability to be viewed on a computer screen in Tennessee or their ability to be printed out in hard copy in that distant location.

*Id.* at 707.

That observation may be imported to this matter. As for the second argument in *Thomas*, the Sixth Circuit concurred with the Air Force Court of Criminal Appeals in *Maxwell* that transmission by computer fell squarely in the conduct covered by the obscenity law. *Id.* at 708–09.

It bears pointing out that both these opinions interpreted a statute which, at that time, did not explicitly mention the word "computer" as nevertheless punishing the trafficking of obscenity by computer. In light of that fact, this court would be remiss to hold that the child pornography statute, which at present and at the time of the conduct alleged in the indictment did expressly prohibit transmission of the subject material "by computer" does not apply to transmission of GIF files over a modem, which can then be converted to visual depictions of children engaged in sexually explicit conduct on a computer monitor screen on the other end of a telephone line. The use of the words "by computer" are sufficient to cover this conduct. Congress was no more required to explain in intricate detail the technology of sending pictures over the Internet than it was to explain the chemical process of developing film into photographs. This court will not indulge in metaphysical hair-splitting to rule that "by computer" does not give constitutionally adequate notice that defendant's alleged activity in this case is prohibited.

A survey of the reporters unearths the following cases finding various elements of the Protection of Children Act sufficiently clear that average people could understand what is prohibited; unsurprisingly, some of the same cases belying the proposition that the Act is unconstitutionally overbroad also reject the vagueness argument. *E.g., United States v. Colavito*, 19 F.3d 69, 71–72 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 634, 130 L.Ed.2d 540 (1994); *United States v. X-Citement Video, Inc.*, 982 F.2d 1285, 1287–89 (9th Cir.1992), *rev'd on other grounds*, —— U.S. ——, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994); *United States v. Arvin*, 900 F.2d

---

580 n. 4. The omission does not affect the reasoning therein.

7. Since the *Maxwell* decision, Congress has made it clear that the obscenity statute does punish transmission by computer. *See* Telecommunications Act of 1996, Pub.L. 104–104, § 507(b), 110 Stat. 56, 137. Recent decisions by three-judge district courts holding certain aspects of Title V of the Telecommunications Act, also known as the Communications Decency Act,

unconstitutional do not affect the validity of this amendment to the obscenity statute. *See, e.g., ACLU v. Reno*, 929 F.Supp. 824, 865 & 863 (E.D.Pa.1996) (obscenity and child pornography can be punished).

The child pornography statute has expressly prohibited computer transmission since it was amended by the Crime Control Act of 1990, Pub.L. 101–647, § 323(a)(3)(B) & (b), 104 Stat. 4789, 4818–19.

1385, 1388 (9th Cir.1990), *cert. denied,* 498 U.S. 1024, 111 S.Ct. 672, 112 L.Ed.2d 664 (1991); *United States v. Wolf,* 890 F.2d 241, 246 (10th Cir.1989); *United States v. O'Malley,* 854 F.2d 1085, 1087 (8th Cir.1988); *United States v. Reedy,* 845 F.2d 239, 241 (10th Cir.1988), *cert. denied,* 489 U.S. 1055, 109 S.Ct. 1318, 103 L.Ed.2d 587 (1989); *United States v. Wiegand,* 812 F.2d 1239, 1244 (9th Cir.), *cert. denied,* 484 U.S. 856, 108 S.Ct. 164, 98 L.Ed.2d 118 (1987); *United States v. Freeman,* 808 F.2d 1290, 1293 (8th Cir.), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987); *United States v. Smith,* 795 F.2d 841, 846 (9th Cir.1986), *cert. denied,* 481 U.S. 1032, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987); *United States v. Long,* 831 F.Supp. 582, 587 (W.D.Ky.1993); *United States v. Tolczeki,* 614 F.Supp. 1424, 1426 (N.D. & E.D.Ohio 1985); *United States v. Andersson,* 610 F.Supp. 246, 249–50 (N.D.Ind.1985), *aff'd,* 803 F.2d 903 (7th Cir.1986), *cert. denied,* 479 U.S. 1069, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); *United States v. Nemuras,* 567 F.Supp. 87, 89 (D.Md.1983), *aff'd,* 740 F.2d 286 (4th Cir.1984); *United States v. Carroll,* No. Crim.A. 92–10131–Z, 1992 WL 333958, at *2 (D.Mass. Oct. 14, 1992); *United States v. Maday,* No. 88–CR–145E, 1989 WL 103666, at *2 (W.D.N.Y. Sept. 6, 1989); *cf. United States v. Marquardt,* 949 F.2d 283, 286 (9th Cir.1991) (prepubescent enhancement in sentencing guidelines not vague).

The vagueness and overbreadth arguments are without merit.

### 2. Simple Possession

 In another First Amendment argument, defendant points to *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) for the proposition that the Constitution forbids the punishment of mere possession of child pornography in one's own home. *Stanley* of course dealt with possession of obscenity, not child pornography. And the Supreme Court expressly held that simple possession of child pornography may be punished consonant with the Constitution in *Osborne v. Ohio,* 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990).

Defendant attempts to distinguish *Osborne* by observing that the Ohio statute at issue

there, unlike the New York law in *Ferber* or the federal law here, made explicit exceptions for certain "bona fide artistic, medical, scientific, educational, religious, governmental, judicial, or other proper purpose[s]." *Id.* at 106, 110 S.Ct. at 1694. However, the Court suggested that a statute without express exceptions, like the New York law, also could proscribe mere possession. *See id.* at 114 n. 11, 110 S.Ct. at 1699 n. 11. The availability of the unconstitutional-as-applied defense undoubtedly solves any trouble here, as explained more fully supra.

### 3. Substantive Due Process

 Defendant's next constitutional challenge to the statute appears to be based neither in overbreadth nor vagueness. Defendant argues that prosecution of end-users of child pornography does not advance the legislative interests underlying the Protection of Children Act. *See* Def.'s Mem. Law, Doc. 23, at 8. Statutes regulating categories of expression that are essentially unprotected by the First Amendment, such as child pornography, will pass muster if they are content-neutral within the entire category, and if they satisfy the rationality analysis of the Due Process Clause. *See R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). *Ferber* itself establishes that child pornography is a minimally protected category. 458 U.S. at 764, 102 S.Ct. at 3358. And the *R.A.V.* majority opined that *Ferber* held the child pornography statute at issue there did not censor a particular literary or political theme. *R.A.V.,* 505 U.S. at 384, 112 S.Ct. at 2543 (quoting *Ferber,* 458 U.S. at 763, 775, 102 S.Ct. at 3357–58, 3364). Since this court has already noted the substantial similarity of the expression proscribed in the New York statute and the federal law, we hold that the Protection of Children Act does not discriminate based upon content within the minimally protected category of child pornography.

From that point, it is easy to conclude that, consonant with substantive due process, the Protection of Children Act is rationally related to a legitimate government interest. *See Ferber,* 458 U.S. at 756–57, 102 S.Ct. at 3354–55 (interest in protecting children is "compel-

ling," not merely legitimate); *id.* at 759, 102 S.Ct. at 3355–56 (distribution of child pornography related to welfare of children in two ways); *id.* at 760, 102 S.Ct. at 3356 (drying up market for child pornography helps reduce production). If defendant is arguing that the Protection of Children Act is ineffective at curtailing the production of child pornography, his argument is best addressed to the Congress, not this court. For the purposes of disposing of defendant's argument, it is enough to conclude that the Act punishes trafficking in an entire category of minimally protected speech, and that the law is rationally related to the government's legitimate interest in stemming the flow of child pornography in interstate commerce.

### 4. Procedural Due Process

■ Defendant makes one other stab with the due process spear, this time with its procedural end. He argues the Protection of Children Act punishes wholly passive conduct which the average member of the community would not realize was illegal, in violation of the notice principles in *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). *Lambert* was a completely different case. There, the Supreme Court invalidated a conviction based on a Los Angeles municipal code section which required all convicted felons staying in Los Angeles for five days or more, or who visited Los Angeles five times in a 30-day period, to register with the police chief. In contradistinction, the possession and distribution of child pornography is an activity which the average person would think unlawful. Moreover, the conduct defendant is charged with is not wholly passive, but rather involves transmission over the computer and possible solicitation of downloads from like-minded individuals. The enforcement of the federal child pornography law does not violate of the notice requirements of due process.

In sum, the court declines to hold the Protection of Children Act unconstitutional under the First Amendment or the Due Process Clause of the Fifth Amendment. Defendant's overbroad-as-applied defense must await trial.

### B. Pretrial Evidentiary Hearing

■ Defendant argues the government must prove that the minors depicted in the images the government will introduce against him are *actual* children. To this end, he proposes a pretrial evidentiary hearing pursuant to Criminal Procedure Rule 12(b) and Evidence Rule 104.

■ The United States does not dispute that "the indictment and the statute require the government to prove that the depictions are of actual minors." Gov.'s Response, Doc. 31, at 4. This court agrees. "Minor" is defined in the Protection of Children Act as "any person under the age of eighteen years." 18 U.S.C. § 2256(1). Thus, a cartoon character, a computer-animated image, a person eighteen or over who appears to be a minor, or an image of of an adult "doctored" by computer or other means to appear younger are not covered by the statute. Although the welfare of children might well be served by prohibiting, for instance, the trafficking of child pornography cartoons, it does not appear that Congress intended such a result. *See, e.g.,* S.Rep. 438, 95th Cong., 2d Sess. 5 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 43 (finding that use of children as the subjects of pornographic materials is very harmful to both the children and the society as a whole).

Requiring the government to pre-prove that the children depicted are real in an evidentiary hearing before the court is another matter. Criminal Procedure Rule 12(b) provides that "[a]ny defense, objection, or request which is capable of determination *without the trial of the general issue* may be raised before trial by motion." The italicized language points out the flaw in defendant's request. The question of whether the images are of actual children under eighteen is an element of the crime that the government must prove at trial, and as such is part of the general issue of guilt.

Defendant may be asking the court to set ground rules for proof of this element—by requiring expert testimony on the age of the persons depicted, for example. There is one rule: the government must prove every element of the crime beyond a reasonable

doubt. Beyond that, the court declines to tell the United States how to prosecute its case. *See United States v. Nolan,* 818 F.2d 1015, 1016–18 (1st Cir.1987). If the proof fails as a matter of law with respect to any element, the defendant may make the appropriate motion at the end of the government's case-in-chief.

## C. *Search of AOL's Offices*

Defendant moves to suppress the evidence relating to his AOL account seized from AOL's headquarters in Vienna, Virginia pursuant to a search warrant issued by Magistrate Judge W. Curtiss Sewell of the Eastern District of Virginia on September 12, 1995. This warrant was to search not only records at AOL corresponding to defendant, but to 77 other suspected child pornography traffickers as well. *See* Attach. to Gov.'s Response, Doc. 31; Ex. E att'd to Def.'s Mem. Law, Doc. 23. Initially, the court observes that this particular warrant was signed on the same day Magistrate Judge Gustave J. DiBianco of this district issued the search warrant for Michael Lamb's home in Marcellus, New York. It appears that federal agents executed both of the searches on the following day, Wednesday, September 15, 1995. Because the searches were contemporaneous, whatever evidence of crime was unearthed by the AOL warrant could not have contributed to the probable cause determination to issue the Lamb search warrant, contrary to defendant's assertion that "[t]he material seized and searched as a result of the Virginia warrant was the direct predicate for seeking the warrant against Mr. Lamb from Magistrate DiBianco." Def.'s Mem.Law, Doc. 23, at 14.[8] However, since the government may still introduce evidence secured through the AOL warrant at trial, the court will decide the motion.[9]

Defendant contends that the search violated the Fourth Amendment's prohibition against unreasonable searches and seizures. We consequently start with the familiar principles of probable cause. First, it is "practical, nontechnical conception." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). Whether it exists in particular circumstances is a decision influenced by "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 175, 69 S.Ct. at 1310. Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). When a district judge is asked to find error in a magistrate's prior determination that a warrant should issue, *Gates* provides further guidance:

> The task of the issuing magistrate is simply to make a practical, common-sense decision, whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

*Id.* at 238–39, 103 S.Ct. at 2332 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

Thus, the level of this court's scrutiny is not de novo. *Id.* 462 U.S. at 236, 103 S.Ct. at 2331.

The magistrate had before him a 57–page affidavit with numerous attachments from Special Agent David Roden of the Baltimore FBI office. Agent Roden has been an FBI agent since 1984. He consulted with Special Agents Lanning, a child pornography expert, and Pollitt, a computer crimes expert. It is true, as defendant points out in his challenge to the search of his home, Def.'s Mem.Law.,

---

8. It is clear from the context of defendant's memorandum that he is referring to the warrant for the search of his home, not the later-issued arrest warrant.

9. Because the government does not argue otherwise, the court assumes that defendant has a reasonable expectation of privacy in the electronic information relating to his account in the computers at AOL's Virginia headquarters.

Doc. 23, at 24, that the affidavit contains a large section of boilerplate language, namely the hearsay information from Agents Lanning and Pollitt. The court suspects this standard language was grafted into every affidavit connected to the Innocent Images operation. However, agents need not reinvent the wheel for every application. The boilerplate section is helpful and relevant as background for these sorts of cases, and is accompanied by case-specific information.

The information relating to defendant in the AOL warrant consists of the following. Paragraph 47(a) identifies the person using account number 082–9841–009 and screen name Josh6979 as a participant in more than 50 transmissions of child pornography involving over 100 distinct images. Paragraph 48(b) relates that AOL revealed, pursuant to a grand jury subpoena, that the defendant used that account number and screen name. The next paragraph informs the judicial officer that a court ordered dialed number recorder (DNR) indicated that calls were placed from Michael Lamb's telephone to numbers associated with AOL.

 This last paragraph, 48(c), presents a slight discrepancy. The AOL affidavit lists defendant's telephone number in August of 1995 as (402) 571–7921, a Nebraska phone number. Turning to the search warrant for defendant's home, the affidavit of Special Agent Tim Dwyer states that the DNR established in August of 1995 was on the number corresponding to Michael Lamb's Marcellus home, (315) 673–4656. The court believes, however, that it has resolved the ambiguity. Turning back a few pages in the AOL warrant, to paragraph 41(c), it appears that the Nebraska number is also listed for another Innocent Images suspect. A search of on-line telephone records confirms that the Nebraska number is assigned to a person living in Omaha with the same name as the targeted individual in paragraph 41(c). From this information, the court assumes a clerical or typographical error was made. Perhaps the agent or attorney composing the affidavit was doing so with a word processing program on a computer. He or she may have copied paragraph 41(c) and "pasted" it at paragraph

48(c), then edited it to make the relevant changes—though omitting to change the phone number.

Since neither defendant nor the government noticed the apparently inadvertent error, the court will not give it undue attention. It does not deprive the warrant of probable cause. *Cf. Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978) (in challenge to warrant, "[a]llegations of negligence or innocent mistake are insufficient"). Doubtless the affidavit could have set forth the fact that a DNR revealed that Michael Lamb was calling AOL numbers, without actually listing the numbers, and it would have sufficed in the context of this warrant. Harmless mistakes can be made, but agents should be careful that in utilizing the labor-saving advantages of word processing over the typewriter, they do not sacrifice accuracy.

Other specific information relating to defendant was included in attachment B–38 to the affidavit. That attachment contained an electronic "paper trail," explained more fully below, listing all the subscribers who received a child pornography image file, "JJ. ZIP," originating from the person using screen name Josh6979. The attachment also included a representative sampling of the files defendant was allegedly transmitting.

The specific information must then be blended with the general information regarding the Innocent Images investigation to see if the available facts logically led to the conclusion that evidence of child pornography trafficking would be found at AOL's headquarters. The magistrate first learned that information relating to child pornography trafficking in the AOL warrant was obtained by one or more of four sources: concerned citizens who complained to the FBI or AOL about child pornography on the service, FBI agents signed on in an undercover capacity who obtained child pornography, Special Agent Doug Rehman of the Florida Department of Law Enforcement and his confidential informant, and court-ordered intercepts of electronic communications. Attach. to Gov.'s Response, Doc. 31, at 13–15. The magistrate also was informed that the image files these sources obtained were accompa-

nied by mail messages. *Id.* at 16. Each mail message lists

> the screen name of the AOL subscriber who first uploaded the image file onto the computer system, the screen name of the subscriber(s) to whom it was forwarded, the date and time of the transmission, and the title of the image file. Additionally, the mail message indicates the screen name of the AOL subscriber to whom the first recipient subsequently forwarded the image file, the date and time of that transmission, and the title of the file transmitted. In this manner, the screen name of each recipient and forwarder of a particular image, as well as the date and time of each transmission, is documented continuously until the document came into the possession

of one of the four sources. *Id.* at 16–17. So each depiction of children engaged in sexually explicit conduct that came into the possession of law enforcement was accompanied by a convenient electronic "paper trail."

■ From these paper trails, it was discovered that the person using the Josh6979 screen name was involved in numerous transmissions. *Id.* ¶¶ 48(a) to (c). A grand jury subpoena to AOL revealed that the screen name was defendant's. A DNR on his home number confirmed he subscribed to AOL. The magistrate was presented with one such paper trail corresponding to an image file, "JJ.ZIP", which indicated defendant transmitted the file in March of 1995. He was also provided with the images in that file—"a series of pictures of a boy appearing to be eight years old in various masturbation and other sexually suggestive poses," along with a sampling of other images. Gov.'s Response, Doc. 31, at 8. Defendant objects that the magistrate should have seen all the images he allegedly transmitted, but the agent affirmed that the samples were representative of the whole. Since the judicial officer may rely on hearsay statements when approving search warrants, *e.g.,* Fed.R.Crim.P. 41(c)(1), this objection is of no moment. Magistrate Sewell need not have viewed every file, but could have relied on the agent's assurance that the images he was presented with were typical of the lot. *E.g., United*

States v. Espinoza, 641 F.2d 153, 163–64 (4th Cir.), *cert. denied,* 454 U.S. 841, 102 S.Ct. 153, 70 L.Ed.2d 125 (1981); *Commonwealth v. Dane Entertainment Servs.,* 389 Mass. 902, 452 N.E.2d 1126, 1130 (1983); *People v. Hobbs,* 59 Ill.App.3d 793, 17 Ill.Dec. 83, 89, 375 N.E.2d 1367, 1373 (1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1547, 59 L.Ed.2d 795 (1979).

■ From this information, it was no great leap to conclude that evidence of the crime of child pornography trafficking was likely stored in the computer records of AOL in Virginia. On that issue, defendant alleges fault with the scope of evidence sought by the warrant. The Fourth Amendment mandates warrants "particularly describing the place to be searched, and the persons or things to be seized." Defendant asserts that the latter element of the particularity requirement has not been met in the instant matter.

■ Particularity in identifying the items sought is required to prevent general searches such as were practiced by royal revenue officers in the colonies prior to the Revolution. *See Boyd v. United States,* 116 U.S. 616, 624, 6 S.Ct. 524, 528–29, 29 L.Ed. 746 (1886). It also sharply curtails the discretion of the executing law enforcer, since the magistrate alone delineates what is to be seized pursuant to the warrant and what must be ignored. *See Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927) (particularity requirement "prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."). Lastly, particularity prevents "the issuance of warrants on loose, vague, or doubtful bases of fact." *Go–Bart Importing Co. v. United States,* 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931). This is related to the requirement of probable cause. If there is indeed probable cause to believe the fruits or instrumentalities of crime are to be found in a particular place, the warrant applicant should be able to explain to the magistrate with some specificity what those items are. *Cf. In re Grand Jury Proceedings,* 716 F.2d 493, 497–98 (8th Cir.1983) (holding not partic-

ular a warrant authorizing seizure of items not related to crime being investigated).

The list of items sought in the AOL warrant is attached as Schedule A. First, the agents seek the seizure of floppy diskettes containing electronic mail messages sent to and received by the seventy-eight individuals targeted in the warrant. The affidavit gives a sufficient basis for the seizure of these items. The following excerpts are illuminating:

> America Online[ ] offer[s] their subscribers the ability to communicate publicly or privately with each other in real time in the form of "chat rooms." Contact with others in this online format can be either very open and anonymous, in front of everyone else who happens to be in the same room at the same time, or very private and personal in the form of person to person instant messages.

> . . . .

> The open and anonymous communication allows the user to locate others of similar inclination and still maintain their anonymity. Once contact is established, it is then possible to send text messages and graphic images to a trusted conspirator.

Attach. to Gov.'s Response, Doc. 31, at 7–8.

The magistrate later learns that the communication can be "either in real time if the other subscribers are simultaneously on line, or via electronic mail." *Id.* at 9. Image files can be attached to the e-mail messages. *Id.* at 9–10. The Innocent Images investigation "identified numerous individuals who use the computer to openly solicit child pornography from other users of the particular bulletin board service." *Id.* at 11. After child pornography transmissions have occurred, "these individuals often put each other on their mailing list and send future images in the hopes of further trades." *Id.* at 12.

Also pertinent to whether stored e-mail messages of the seventy-eight individuals are relevant to the trafficking of child pornography is the following information:

> Many of the electronic mail messages which accompanied the images themselves refer to the nature of the images (i.e. child pornographic images) and the relationship between AOL subscribers who regularly trade in child pornography. The electronic mail messages contain statements such as: "You like these and I will be doing some more real soon. I like the young ones but do prefer 14–16/. The dicks you know." (ATTACHMENT B(17)). "You absolutely must DownLoad this file! It's a very young 'Ashley' performing for the camera. I estimate her age to be about 12 years old and she does have small bikini tan lines on her chest but is almost totally flat-chested and she is hairless." (ATTACHMENT B(18)).

*Id.* at 17.

From this information Magistrate Sewell could have determined that the e-mail messages were instrumentalities of the crime in that they are used by child pornography traffickers to locate and communicate with other persons of like mind. The messages are also evidence of the crime in that they sometimes describe the images they accompany in transmission. The warrant was not too broadly drafted in including these messages within its scope.

Schedule A also seeks "[a]ll stored files in original format in individual files" and any printouts of the same. There was probable cause to believe that some of those files were image files containing the forbidden depictions. Although the language does not limit investigators to seizing image files only or image files of child pornography only, the actual content of a computer file usually cannot be determined until it is opened with the appropriate application software on a computer.[10] The agents who were tasked to

---

10. Even when the filename is known ahead of time (because it is written on a label on a floppy diskette for instance), it would rarely if ever be possible to know if the data in the file contains child pornography, without viewing it on a monitor. Taking examples from the transmission log corresponding to the Josh6979 screen name, we find filenames such as "trade1.gif" or "LL04.-

gif." *See* Ex. B att'd to Lamb Warrant, Ex. F att'd to Def.'s Notice of Motion, Doc. 22. Obviously, these names do not reveal or even suggest the actual contents of the file. The suffix GIF suggests it is an image file, but it could be an image of anything. Filenames such as "2teensuk.gif" and "2butts.gif" are suggestive, but they could still conceivably be anything, including

obtain account records related to seventy-eight individuals were not obligated to identify the contents of computer files on AOL's premises. *United States v. Kimbrough,* 69 F.3d 723, 728 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1547, 134 L.Ed.2d 650 (1996). Because there was probable cause to believe that stored files in the accounts of the suspects contained evidence of the crime, *viz.* the depictions of child pornography themselves, the warrant properly authorized the search and seizure of these particular items.

 Schedule A next seeks log files of the sign-on activity of the seventy-eight suspects. The times that defendant was logged on to AOL is evidence of crime. The sign-on logs could corroborate the information in the electronic paper trails regarding which dates transmission occurred on. The schedule also seeks the suspects' business records in AOL's possession, including actual names, all screen names those suspects use, all account numbers, methods of payment, and address and phone records. The actual names obviously are evidence of who are perpetrating the crimes. It is important that the warrant seek *all* screen names and account numbers because, as the affidavit relates,

> subscribers generally have multiple screen names on their account.... To avoid detection, it is not uncommon for these individuals to discard previously used screen names and continue their activities under new screen names and newly created profiles.

Attach. to Gov.'s Response, Doc. 31, at 12.

Address and phone records help locate the perpetrators, and confirm other evidence regarding the identities of the traffickers. Billing and payment information is conceivably necessary because "subscribers sometimes provide AOL with fictitious account information, such as nonexistent addresses or false telephone numbers." *Id.* Billing information may assist investigators in locating the

suspects when telephone and address information proves to be false.

All of the items sought are relevant to the crime and potentially evidence or instrumentalities thereof. They are sufficiently particular that the executing agents knew what they were looking for. This final challenge to the AOL warrant must be dismissed.

In sum, the motion to suppress evidence obtained by the warranted search of AOL's offices in Vienna, Virginia is denied. The court proceeds to the Fourth Amendment challenge to the search warrant for defendant's house in Marcellus, New York.

### D. Search of Defendant's Home

. Of course, the same canons of law set forth in the preceding section apply with equal force to defendant's motion to suppress evidence seized from his home on September 13, 1995. The court therefore will not reiterate the principles of probable cause or particularity. With regards to the search warrant executed at his home, defendant argues that the information supplied to Magistrate DiBianco was stale, that the affidavit contained boilerplate language rendering it not particular, and that the affidavit was sullied by false and misleading statements. In a supplemental filing, Doc. 39, defendant refers the court to the report-recommendation of a magistrate from the Southern District of Florida. In that matter—apparently another Innocent Images case—Magistrate Judge Ann E. Vitunac recommended that the district court grant the defendant's motion to suppress evidence recovered pursuant to a search warrant of his home. To date, the district court has not acted upon that report-recommendation.

 The doctrine of staleness applies when information proffered in support of a warrant application is so old that it casts doubt on whether the fruits or evidence of a crime will still be found at a particular loca-

---

adult pornography. Admittedly, a filename such as "13yrscum.jpg" strongly indicates the file is a child pornography image, but there is no technological limitation that the filename must describe the file contents.

In these circumstances it is unreasonable to require the executing officers to identify which

files actually contain child pornography and which do not in AOL's Virginia headquarters. That task may be more properly performed by a government computer technician at an FBI lab or office.

tion. When determining whether information is stale or not, the judicial officer must not only consider the age of the information, but the nature of the evidence sought. Some kinds of evidence are more evanescent than others. Some contraband, like narcotic drugs, are consumable. Other evidence, like an illegal firearm, is more apt to remain in one place for extended periods. As one court put it, "[t]he hare and the tortoise do not disappear at the same rate of speed." *Andresen v. Maryland*, 24 Md.App. 128, 331 A.2d 78, 106 (1975), *aff'd*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).

■ The staleness contention is simply that investigators did not search defendant's house until September 13, 1995 while the last known transmission of child pornography involving defendant occurred on April 5, an elapsed period of over five months. The affidavit before Magistrate DiBianco contained hearsay information from FBI Special Agent Lanning, an expert in this field, that collectors of child pornography rarely dispose of materials they obtain and "almost always maintain and possess their material ... in the privacy and security of their homes or some other secure location." Ex. F att'd to Def.'s Notice of Motion, Doc. 22, at 2–3. The magistrate also had evidence that defendant accessed his AOL account from a computer at his Marcellus home. In addition to the DNR which indicated phone calls to AOL numbers from defendant's home and the information yielded by the grand jury subpoena, Special Agent Tim Dwyer had subpoenaed phone records for defendant's home number. *Id.* at 19. At least one number defendant had called twice in January of 1995 was a computer data line. A ruse phone call by Agent Dwyer on September 6, 1995 elicited from defendant that one computer was located in his house and that it was used to access AOL. Furthermore, Agent Roden, who was responsible for the affidavit supporting the AOL warrant, informed Agent Dwyer that defendant was still actively using his AOL account in September of 1995 under a different screen name, *id.* at 20, although it appears that the more recent usage did not involve transmittal of child pornography. From this information, the magistrate could have found probable cause

that evidence of crime would be found at defendant's home.

The observation that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes is supported by common sense and the cases. Since the materials are illegal to distribute and possess, initial collection is difficult. Having succeeded in obtaining images, collectors are unlikely to quickly destroy them. Because of their illegality and the imprimatur of severe social stigma such images carry, collectors will want to secret them in secure places, like a private residence. This proposition is not novel in either state or federal court: pedophiles, preferential child molesters, and child pornography collectors maintain their materials for significant periods of time. *E.g., United States v. Harvey*, 2 F.3d 1318, 1322–23 (3d Cir.1993) (delivery of materials occurred between two and fifteen months prior to search); *United States v. Koelling*, 992 F.2d 817, 823 (8th Cir.1993); *United States v. Rabe*, 848 F.2d 994, 997 (9th Cir.1988); *United States v. Rakowski*, 714 F.Supp. 1324, 1331 (D.Vt. 1987); *Gregg v. State*, 844 P.2d 867, 873 (Okla.Crim.App.1992); *People v. Russo*, 439 Mich. 584, 487 N.W.2d 698, 704–06 (1992) (six and one-half years); *State v. Petrone*, 161 Wis.2d 530, 468 N.W.2d 676, 682, *cert. denied*, 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991); *State v. Young*, 37 Ohio St.3d 249, 525 N.E.2d 1363, 1372 (1988), *rev'd on other grounds sub nom. Osborne v. Ohio*, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990); *State v. Woodcock*, 407 N.W.2d 603, 605 (Iowa 1987) (one and one-half years).

Of course, before the presumption that pedophiles, preferential child molesters, or child pornography collectors hoard their materials for extended periods can be applied, the judicial officer scrutinizing the warrant application must have sufficient information from which it can be concluded that the target falls within these categories. The Ninth Circuit rejected the application of this presumption in *United States v. Weber*, 923 F.2d 1338 (9th Cir.1990). In *Weber*, the facts alleged in the affidavit in support of the warrant were that the suspect made "one order solicited by the government" for child

pornography which was never delivered, and the suspect "had been sent advertising material that was described by the customs agent who intercepted it as 'apparently child pornography'" two years earlier. *Id.* at 1344. From this sparse information, the Ninth Circuit ruled that there was insufficient information to determine whether the target of the search was a pedophile, child molester, or child pornography collector. *Id.* at 1345. Without such information, the expert opinion that·such people maintain large collections of the illegal materials in their homes was of little value in determining whether evidence of crime would be located at the suspect's home.

The government responds to the *Weber* issue with *United States v. Peden,* 891 F.2d 514 (5th Cir.1989). The affidavit accompanying the warrant application in that case informed the magistrate "that pedophiles often collect large quantities of certain types of child pornography." *Id.* at 518. The Court of· Appeals for the Fifth Circuit ruled that

> [a]lthough the affidavit lacked direct testimony that Peden himself was this type of compulsive pedophile, the magistrate might reasonably draw such a common-sense conclusion from the repeated documented instances of Peden's sexual interest in young boys. If she did draw this conclusion, then the magistrate could also logically conclude that there was a fair probability that Peden maintained a collection in his home of the type of materials described in the affidavit.

*Id.* at 518–19.
This case provides shaky support for the United States.· In the matter sub judice, unlike *Peden,* ·there is no indication that defendant has had prior problems involving the sexual abuse or exploitation of children. The only factor which supported the notion that defendant fell within the class of persons likely to hoard a large collection of child pornography was the sheer number of transmissions he was allegedly involved in and the length of time over which they occurred: over 100 transmissions involving over 150 images over an eight-month period. Ex. F att'd to Def.'s Notice of Motion, Doc. 22, at 15–16. This pattern of activity is inconsis-

tent with someone who merely succumbed to an aberrational deviant prurience on a single occasion.

To end-around the *Weber* question however, this court held holds that the magistrate need not have concluded that defendant was a pedophile, preferential child molester, or child pornography collector in order to decide that evidence of crime would likely be found at defendant's house in September of 1995. The nature and characteristics of computer storage systems leads the court to believe that five and a half months is not so long that one would expect a computer file to be erased.

One of the, great attractions of computer storage over hardcopy storage is that a relatively small device, i.e. a floppy diskette, the internal hard drive of a computer, or other magnetic media, can hold a great amount of data reliably over a long period of time. The declining costs and increasing capacity and availability of computer storage devices convinces many users to buy more hardware rather than delete old files. These observations concerning the characteristics of computer storage are contained in the affidavit. *Id.* at 8. Suffice it to say Magistrate DiBianco had before him sufficient reliable information that he could determine that computer files of child pornography might be retained even longer than hardcopy child pornography. Combined with the not excessive passage of time between the last transmission and the search, the large number of images involved, and the period of time over which the transmissions occurred, this court rules that the information underlying the warrant was not so stale that probable cause was lacking.

■■■■ Defendant raises several objections to the effect that the description of evidence sought by the warrant is insufficiently particular or overbroad—for instance, because it authorizes the seizure of gay male pornography, which is not illegal. That does not appear to be true. Exhibit A attached to the warrant for the search of Michael Lamb's home contains the schedule of items investigators were searching for. Ex. F att'd to Def.'s Notice of Motion, Doc. 22. That

schedule seeks seizure of various kinds of media

which may be, or are used to visually depict child pornography, child erotica, information pertaining to the sexual interest in child pornography, sexual activity with children or the distribution, possession or receipt of child pornography, child erotica or information pertaining to an interest in child pornography or child erotica.

Gay adult material is not mentioned. It may be true however that in seizing some videotapes which appeared at first inspection to contain some form of pornography, agents in fact seized some adult pornography materials not covered by the warrant. Even a warrant that is sufficiently particular on its face may be invalidated if the executing agents disregard its limitations. *E.g., United States v. Medlin*, 842 F.2d 1194, 1198 (10th Cir.1988); *United States v. Rettig*, 589 F.2d 418, 423 (9th Cir.1978).

The government again relies on the Fifth Circuit's decision in *United States v. Kimbrough*. In that case,

the law enforcement agents seized virtually every record, document and paper found at the premises, and confiscated every video and audio cassette tape. The Government denies that the search was overbroad. Specifically, the Government, through the testimony of Agent Johnson at the suppression hearing before the trial court, argues that the seizure of all video and audio tapes was necessary because the titles of such tapes were not dispositive of their content and that the absence or presence of child pornography in such items could not be determined by a cursory examination on the premises.

69 F.3d 723, 728 (5th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1547, 134 L.Ed.2d 650 (1996).

Writing for the panel, District Judge Prado held that "[t]he fact the executing officers chose not to review each video tape, audio tape and document on the premises does not make this search presumptively invalid." *Id.* Although no other cases have been found on point, *Kimbrough* is a reasonable approach to the problem of determining whether an item is contraband or evidence of crime when the item's nature is such that the decision cannot be made by on-the-spot inspection, or where the sheer number of potentially covered items frustrates an immediate determination.

The case at bar is illustrative. The evidence recovery log indicates that eighteen VHS format videocassettes were found in defendant's home. Ex. C att'd to Def.'s Notice of Motion, Doc. 22. Titles included "It's the Size That Counts," "Reflections of Youth," "Halloweenie," "Boy oh Boy," "Schoolmates I," and "Junior Varsity." There were also thirteen eight millimeter film reels, four of which had the word "boys" in their titles. It is patently unreasonable to expect the FBI agents executing the search to watch all 31 movies in defendant's home—moreover this court cannot believe such an approach would be desirable to defendant or his family. Removing the tapes and films to the office of the FBI or U.S. attorney where they can then be reviewed for depictions of children engaged in sexually explicit conduct, then returning the tapes which do not contain such images, is the pragmatic approach.

▇▇▇ The computer presented a similar problem. Defendant argues that "[t]he seizure of the computer is not the seizure of evidence or instrumentalities," but rather that "[t]he material on the hard drive is the material that is the instrumentalities and fruits." Def.'s Mem.Law, Doc. 23, at 26 n. 8. First, the computer may very well be an instrumentality of the crime, if it were the one being utilized to send and receive the image files of child pornography over AOL. And second, if some of the image files are stored on the internal hard drive of the computer, removing the computer to an FBI office or lab is likely to be the only practical way of examining its contents. This court has learned that FBI procedure for examining what is stored in a computer involves making a backup copy of the entire hard drive of the system. They then may run programs to recover deleted files. All the image files would have to be viewed in order to see if they contain the proscribed depictions. Like viewing the 31 seized films, examining the computer is not a task that can easily or pragmatically be done at the

premises being searched, as is explained by Agent Pollitt in Agent Dwyer's affidavit. *See* Ex. F att'd to Def.'s Notice of Motion, Doc. 22, at 10–12. Computers image files and videotapes are different media than magazines. While agents may be able to determine if the latter contain child pornography depictions simply by flipping through the pages, newer technology presents different exigencies.

■ Turning to the more general challenge to the particularity of the schedule of items to be seized, this court is content to hold that all the items sought were particularly described, and there was probable cause to believe they were likely to be fruits, instrumentalities, or other evidence of the crime of child pornography trafficking. It is evident from the schedule attached to the Lamb warrant that child pornography refers to materials containing visual depictions of minors engaged in sexually explicit conduct as defined by the Protection of Children Act. While some courts seem to require that a warrant describe the items sought "in the graphic terms of the statute on the sexual exploitation of children," *United States v. Koelling*, 992 F.2d 817, 821 (8th Cir.1993) (quotation omitted), others have held that reference to the statute itself without parroting its terms is sufficient, *United States v. Rabe*, 848 F.2d 994, 997 (9th Cir.1988). In fact, the *Koelling* opinion cites *Rabe* with approval. 992 F.2d at 821. In *United States v. Dornhofer* the warrant sought materials "depicting minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256." 859 F.2d 1195, 1198 (4th Cir.1988), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989). The Fourth Circuit felt that reference to the statute was the equivalent of a description "in the graphic terms of the statute." *See id.*

The term "child erotica" is defined in an asterisk note on page three of Agent Dwyer's affidavit. It is sufficiently particular. It is also properly the subject of a search for evidence of violations of the Protection of Children act by the reasoning that such evidence is relevant to the questions of defendant's predisposition or lack of mistake concerning the outlawed materials. *See*

*Dornhofer*, 859 F.2d at 1198–99; *cf. United States v. Harvey*, 991 F.2d 981, 995 (2d Cir. 1993) (simulated child pornography).

■ Defendant's memorandum section addressing the search of his home is sprinkled with various other complaints. Defendant objects to the boilerplate hearsay information from Agents Lanning and Pollitt, suggesting the discussion of pedophiles, child molesters, and child pornography collectors was unduly prejudicial. This court disagrees. There is no reason to suspect the magistrate judge's neutrality was affected by this fairly dry and clinical material.

[31] Defendant also contends that the government failed to disclose the role of Title III wiretaps in their investigation. The affidavit accompanying the AOL warrant reflects that evidence against six of the Innocent Images suspects was secured by court-ordered communications intercepts; however, those six resided in the Eastern District of Virginia. *See* Attach. to Gov.'s Response, Doc. 31, at 15. The affidavit accompanying the Lamb warrant makes no indication that wiretaps were used in the investigation of Michael Lamb.

■ Defendant claims that reference to the messages accompanying the image transmissions was inappropriate since the sender's identity is unknown. The messages were allegedly attached to the images originating from the person using defendant's screen name and account number; whether defendant is the sender is a question that will presumably be answered at trial.

■ Defendant maintains that the magistrate received the false impression that defendant was transmitting child pornography to minors. Reading the Dwyer affidavit, the court finds a reference in the boilerplate background section provided by Agent Lanning: pedophiles "commonly use this type of sexually explicit material to seduce, to arouse the selected child partner, and to demonstrate the desired sexual acts." Ex. F att'd to Def.'s Notice of Motion, Doc. 22, at 3. Information specific to Michael Lamb begins on page 15, and there are no such references thereafter. There are further references to

transmissions to minors in the AOL warrant application, but those documents were not before Magistrate DiBianco.

■■■ Finally, defendant avers that while Magistrate DiBianco was informed that there were over 100 transmissions of child pornography in this case, in fact some of the transmissions were legal child erotica. The court has insufficient information to determine whether this is true. The magistrate though was presented with images described as a representative sample, and this court will give the appropriate deference to his judgment in this regard. This conclusory allegation of deliberate falsehood is insufficient without more to justify further inquiry into the warrant. *See Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978).

We touch briefly on Magistrate Vitunac's report recommending that the suppression motion of another Innocent Images defendant, Benjamin Isgut, be granted.[11] It hardly needs be said that the report-recommendation, having been neither adopted nor rejected by the Southern District of Florida, is of limited precedential value. But more importantly, the warrant application in that case is too distinguishable from the one presently before the court. The last known transmission in *Isgut* occurred in October of 1994, nearly a year before the nationwide Innocent Images searches, Doc. 39 at 4, compared to five and one-half months in the case at bar. Only 20 transmissions over three and a half months were involved in *Isgut* versus over 100 (containing over 150 distinct images) over eight months here. Magistrate Vitunac also encountered the *Weber* problem: "[T]he affiant has never shared with us any belief (if such belief he holds) that ISGUT is a collector of child pornography or a pedophile." *Id.* at 8. Although no such opinion was ventured here either, as explained above, Magistrate DiBianco could have reached such a conclusion from the volume and pattern of transmissions defendant Lamb engaged in.

More importantly it appeared that Isgut changed residences sometime "between July 5th and October 14, 1994." *Id.* at 4. After the change of residence, AOL terminated Isgut's account. The affidavit reflected that "17 of the 20 transmissions of the alleged child pornography were done after September 1, 1994." If it appeared to Magistrate Vitunac that 17 of the transmissions occurred after Isgut had moved, and therefore after his account was eliminated—a possible sequence given the time frames in the warrant—she might well have been justified in concluding that there was no probable cause to believe evidence of child pornography trafficking would be found a year later in Isgut's new home. How could Isgut have transmitted anything over AOL without an AOL account? Regardless of whether the magistrate's report is affirmed by the district judge in *Isgut,* there are too many factual discrepancies between that case and the instant proceeding for the court to draw any parallels.

The motion to suppress evidence recovered from the warranted search of Michael Lamb's home is denied. For the same reasons, the derivative motion to exclude statements defendant made to FBI agents at his home as fruits of an illegal search is denied.

### E. Impossibility of Counts 6, 9, and 32

The first indictment in this case was filed in November of 1995. Three of the counts alleged violations of the Protection of Children Act occurring in December of 1995. Obviously, the grand jury cannot return an indictment accusing a defendant of crimes that have not yet occurred. The first superseding indictment corrects these dates, thus the court denies this motion as moot.

### F. Adult Pornography

■■■ The defendant moves to preclude the government from offering adult pornography materials at trial. The United States requests that such decisions await trial. Upon this issue, the court is guided the decision of the Second Circuit Court of Appeals in *United States v. Harvey,* 991 F.2d 981 (2d Cir.1993).

---

11. The case is *United States v. Isgut,* 95–6199– CR, 1996 WL 775064 (S.D.Fla.1995).

In general, adult pornography of whatever kind is in most cases inadmissible in the prosecution's case-in-chief, but conditionally admissible on redirect, government cross-examination of defense witnesses, and the case-in-rebuttal. The condition of course is that the evidence must serve to rebut an inference defense counsel has raised by cross-examination of government witnesses or impeach the testimony of defendant or other defense witnesses. Stated so reductively, the problem sounds no different than other evidentiary questions. But expounding on these considerations, more helpful distinctions resolve into view.

One category that may be troublesome is referred to in *Harvey* as simulated child pornography. A customs agent in that case described such materials as depicting

> older teen-age girls, girls over the age of 18 dressed up to look younger than they really are. By dressed up[, I] mean maybe with pony-tails, bobby socks, just their appearance, they're trying to make the girls look younger than they actually are.... The girls have sex with other people in the films.

*Id.* at 984.

Presumably there is a similar genre involving adult males made to look like boys. Also at issue in *Harvey* was a videotape of a nudist beach which "focused on the breast and genital areas of underage girls, although that tape did not depict sexually explicit conduct." *Id.* This type of material probably falls into the category defined by Agent Lanning as child erotica. *See* Attach. to Gov.'s Response, Doc. 31, at 3 n. 1.

The *Harvey* panel affirmed Judge McCurn's admission of both the simulated child pornography and the child erotica in the government's direct examination of a customs inspector. 991 F.2d at 995. However, it was admissible *only* because an entrapment defense was raised. If such a defense is raised in the case at bar, the court in its discretion may allow the government to present any simulated child pornography or child erotica as evidence of the defendant's predisposition, subject to the Supreme Court's admonition that "[e]vidence of predisposition to do what [is] lawful is not, by itself, sufficient

to show predisposition to do what is ... illegal." *Jacobson v. United States,* 503 U.S. 540, 551, 112 S.Ct. 1535, 1542, 118 L.Ed.2d 174 (1992). The *Harvey* panel interpreted this language from *Jacobson* to mean that introduction of simulated child pornography or child erotica alone is insufficient to prove guilt in a child pornography trafficking case. *See* 991 F.2d at 995. That will likely not be a stumbling block in this case, as it appears the government has other evidence—the image file transmissions of child pornography charged in the indictment and the electronic paper trails linking the depictions to defendant. But if the entrapment defense will not be pursued at trial, the need to present predisposition evidence evaporates, and the simulated child pornography and child erotica may well be inadmissible in the prosecution's case-in-chief. *See* Fed.R.Evid. 403 & 404(b)

Although it was not discussed in *Harvey,* the court holds that the principles elaborated above apply with equal vigor to material the government believes is actual child pornography, but for one reason or another, has declined to charge in the indictment. Although the government may believe a given image does depict a minor engaged in explicit sexual activity, they may choose not to accuse defendant of possessing or trafficking in that image because the age of the performer depicted is too close a factual question. A close question of age is really a choice between whether actual or simulated child pornography is depicted. If the government is not sufficiently confident they can persuade the jury that a particular person is under eighteen, they should not be able to offer the uncharged depictions any more readily than simulated child pornography or child erotica.

*Harvey* also dealt with deviant pornography depicting bestiality, sadomasochism, and sexual activity involving human waste. The admission of these materials was held to be in error. *Id.* at 995. The Second Circuit was of the opinion that the evidence was irrelevant to the disputed trial issues, and moreover, "the likely effect of this evidence was to create disgust and antagonism toward Harvey, and resulted in overwhelming prejudice against him." *Id.* at 996. The court

does not take *Harvey* to mean that adult pornography, whether mundane or unusual, is inadmissible for any purpose. If for example defendant were to testify that he has no interest in pornography at all, the prosecution might choose to impeach such testimony with adult pornography. Or an FBI agent could be called or recalled during the government's rebuttal case to testify as to adult pornography recovered. Similarly, even if an entrapment defense is not raised, simulated or uncharged child pornography or child erotica may be used to impeach or rebut certain testimony.

In short, although *Harvey* provides substantial guidance, questions of admissibility commonly cannot be decided until the trial unfolds. Something inadmissible on direct may come in on redirect, depending on the intervening cross-examination. Items unusable as direct evidence may be utilized to impeach. And even relevant evidence may be excluded if its prejudicial value outweighs its probative value. Fed.R.Evid. 403. Defendant should realize that he holds the key to many of these doors. These tenets of evidence are so fundamental, the court is hesitant to repeat them for fear of patronizing counsel.

The motion to exclude adult pornography from trial is denied without prejudice to renew at trial. Admissibility decisions will be informed by *United States v. Harvey* and the Federal Rules of Evidence.

### G. *Prior Bad Acts and Prior Convictions*

■ Defendant has moved to discover what bad character evidence or prior convictions the government intends to offer at trial. He also moves to exclude reference to a particular acquittal over twenty years old which the government could conceivably attempt to bring in under Rule 404(b). The government requests that these issues be reserved for trial, and avers that "it will notify the defendant before the introduction of [404(b)] evidence and before any reference to such evidence in the presence of the jury." Gov.'s Response, Doc. 31, at 21. As for convictions or acts possibly admissible for impeachment under Rules 608 or 609, the government remarks that "neither Rule 608

or 609 provides for pretrial discovery of impeachment evidence." *Id.* at 22.

Both of those responses understate the United States' obligations. Rule 404(b) provides

that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

The government's response seems to contemplate disclosure during the trial of extrinsic acts it intends to offer, but it has not shown good cause for delaying such disclosure. Given that trial is currently slated for late January of 1997, the court rules that the United States should immediately disclose to defendant what Rule 404(b) evidence it has in its file.

The response to the request for disclosure of prior convictions that might be offered in impeachment is also incomplete. Rule 609(b) provides that pretrial notice must be given of the intention to use at trial convictions more than ten years old, and the government is ordered to give such notice now.

To the extent defendant seeks a pretrial ruling on the admissibility of his prior acquittal under Rule 404(b) the motion is denied for the present. If the government acknowledges that it intends to offer the prior acquittal as a prior bad act, defendant may renew the motion at the final pretrial conference. And as to prior convictions under ten years old, the motion is also denied.

### H. *Individually Sequestered Voir Dire*

■ Defendant moves for individually sequestered voir dire, apparently because he has some concerns that the questions he intends to propound are of a sensitive nature that jurors may be reluctant to answer honestly before the venire. The court is aware that a case of this nature involves provocative and disquieting questions, but defendant should not underestimate the ability of jurors to lay aside any discomfort in discharging their important factfinding roles. In any event, the court will deny the motion without

prejudice to renew at the time of the final pretrial conference. By that time, both parties will have submitted their proposed voir dire questions, and the court will be better equipped to decide whether any of the questions justify the extreme measure of individual juror voir dire.

### I. Expert Testimony on Pedophilia

██ Defendant seeks to exclude expert testimony on pedophilia. The government asks that this issue be reserved until trial. In December of 1995 defendant requested a summary of expert testimony the government intends to introduce at trial pursuant to Criminal Procedure Rule 16(a)(1)(E). Since the government has not provided such a summary, it appears they do not intend to put any experts on the stand as part of their case-in-chief, and the U.S. attorney has communicated as much to the court. The motion is denied as moot. Of course, trial developments may lead the government to offer an expert in rebuttal—if, for example, defendant is permitted to proffer an expert for which no summary has been provided—in which case defendant may certainly renew his motion.

### J. The Government's Role/The Government's Outrageous Conduct

██ Defendant appears to suspect that law enforcement agents in this case may have either transmitted or offered to transmit images of child pornography. However the government avers that "the agents received such transmissions, and ... they did not transmit them." Gov.'s Response, Doc. 31, at 19. This comports with the court's understanding that investigators in the Innocent Images operation were instructed not to distribute any child pornography, but only to solicit it from others. Perhaps as a legacy of *Jacobson v. United States,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), the United States is apparently out of the business of distributing child pornography. However, if any government agent *offered to transmit* child pornography without actually transmitting, that fact should be disclosed pretrial.

The defendant's claim of outrageous government conduct is predicated on his as-

sumption that federal officers were aiding in the circulation of child pornography over AOL. As explained above, that does not appear to be the case, and the motion to dismiss on this ground is denied. Of course, defendant may renew the motion if the facts appear otherwise at trial.

### K. Reciprocal Discovery

Federal Rule of Criminal Procedure 16(b) allows the government to request similar discovery available to defendants under subdivision (a) of that rule, provided the defendant has requested it first. Defendant has done so in a sixteen page letter to the U.S. attorney. Doc. 17. The government's motion for reciprocal discovery is therefore granted.

### III. CONCLUSION

To recapitulate, all the motions predicated on alleged constitutional infirmities of the statute under which defendant is charged are DENIED. Defendant has leave to present an unconstitutional-as-applied defense at trial. The motions for a pretrial evidentiary hearing and to suppress evidence recovered from the searches of American OnLine's Virginia offices and defendant's home are also DENIED. The motion to dismiss certain counts of the original indictment is DENIED as moot. The motions relating to the admissibility of adult pornography, the government's alleged outrageous conduct, and for individually sequestered voir dire are DENIED without prejudice to renew at the appropriate time. The motion to preclude expert testimony on pedophilia is DENIED as moot, but without prejudice to renew in the event the issue resurfaces. The motion for disclosure of Rule 404(b) prior bad act evidence is GRANTED. The motion for disclosure of Rule 609 prior conviction evidence is GRANTED with respect to convictions over ten years old as calculated in that rule, and DENIED with respect to newer convictions. Lastly, defendant's motion to compel the government to disclose what role federal agents may have had in child pornography trafficking is GRANTED with respect to one question: Did any law enforcement officer or confidential informant offer to transmit the proscribed visual depictions to defendant,

whether or not they actually did transmit? It is DENIED with respect to other information.

The government's cross-motion for reciprocal discovery is GRANTED. The parties should prepare for the trial of this matter in the week of January 27, 1997.

It is So Ordered.