### B. Attorney Mackay's Motion to Withdraw as Counsel

The American Bar Association's Model Rules of Professional Conduct govern the practice of law before the District Court of the Virgin Islands. *See* LRCi 83.2(a)(1.) Model Rule 1.16(b)(5) provides that an attorney may withdraw from representation where such has been rendered unreasonably difficult by the client.

While it is a close call, the Court accepts Attorney Mackay's representation that this has happened here. The defendant has made accusations he has no confidence in her ability to represent him. Upon reflection, the Court is not convinced that these claims go to the very heart of counsel's obligation to faithfully represent Byers' interests. Since all that is required is for Attorney Mackay to evaluate the presentence report and allocute at sentencing, it probably was not necessary to relieve her as counsel. After all, defendants are not entitled to choose their appointed attorneys, and this is the second time Byers has moved to withdraw his plea and his present counsel is the third attorney appointed to represent him.[9] Since Attorney Mackay's motion was granted at the close of the evidentiary hearing and Byers has new appointed counsel, this decision will not be undone.

### III. CONCLUSION

For the reasons set forth above, defendant's motion to withdraw his plea of guilty must be denied. Attorney Mackay's withdrawal as defendant's counsel will be allowed to stand. An appropriate order shall issue.

**UNITED STATES of America,**

v.

**Lawrence Charles MATTHEWS.**

**Criminal Action No. AW–97–270.**

United States District Court, D. Maryland.

June 29, 1998.

Order Denying Reconsideration, July 2, 1998.

---

8. At the time of the evidentiary hearing on defendant's motion, his codefendant, Mr. Fredericks, was still awaiting trial. In the interim of that hearing and the publication of this opinion, Mr. Fredericks too has pled guilty.

9. Byers is now represented by Henry Carr, Esq.

Lynne A. Battaglia, U.S. Attorney, Deborah A. Johnston, Jan Paul Miller, Assistant U.S. Attorneys, Greenbelt, MD, for U.S.

Michael V. Statham, Leslie McAdoo-Brobson, and Joseph, Greenwald & Laake, P.A., Greenbelt, MD, for Lawrence Charles Matthews.

David B. Isbell, Kurt A. Wimmer, Mitchell A. Kane, and Harold J. Feld, Washington DC, for Amici Curiae American Civil Liberties Union of Maryland, American Civil Liberties Union of National Capital Area, Amici Curiae National Public Radio, Inc., American Federation of Television and Radio Artist and Radio–Television News Directors Ass'n.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Currently pending before the Court are the various pre-trial motions which were argued and taken under advisement on March 2, 1998. Defendant has moved to dismiss counts eight and ten of the indictment, and also has moved to dismiss the indictment in its entirety. Also pending are two motions in limine, one of which has not been fully briefed.

For the reasons set forth below, the Court will deny Defendant's two motions to dismiss and will grant the Government's motion in limine. The Court will discuss with counsel at the hearing on June 30, 1998 the manner in which Defendant's presentation will be limited, as well as appropriate jury instructions.

### Factual Background

The Defendant is a seasoned reporter who has worked as a journalist for more than thirty years. This case concerns allegations by the United States Attorney's Office that the Defendant both received and transmitted child pornography over the Internet in 1996 in violation of 18 U.S.C. § 2252. The Defendant's motions allege the following facts.

In 1995 the Defendant, while working as a business reporter for WTOP radio in Washington, D.C., became aware of the availability of child pornography over the Internet, and his investigation led to a three-part series on WTOP. During his investigation, Defendant reported to the Federal Bureau of Investigation ("F.B.I.") that he had been in contact with a person who offered her two children for prostitution. Defendant spoke with an agent about the person, and also claims to have had further contacts with the agent regarding the availability of child pornography on the Internet. The Court has not been informed of the details of these alleged additional conversations.

After leaving WTOP to become a freelance journalist, Defendant claims to have continued to investigate child pornography on the Internet, specifically concerning the role of law enforcement agents. It is this alleged further investigation that led to the present indictment. On December 11, 1996, the F.B.I. executed a search warrant, searched Defendant's home, and seized certain materials. The subsequent grand jury indictment, dated July 28, 1997, charges Defendant with eleven counts of receiving and four counts of transporting, via computer, visual depictions of minors engaged in sexually explicit conduct, the production of which involved the use of minors engaged in sexually explicit conduct. The indictment charges Defendant with receiving images on July 18, 29, and 31, 1996, September 4, 9, 12, 23, 24 (two counts), 1996, and December 9 and 10, 1996, and transporting images on September 19, 1996.

## Analysis

### I. Defendant's Motion to Dismiss Counts Eight and Ten of the Indictment

Count seven charges Defendant with transmitting a graphic file titled "KDS01.JPG" on September 19, 1996 at 12:41:36 PM eastern daylight time. The file was allegedly sent to a person using the username "Blonde1024." Count eight charges Defendant with transmitting a graphic file titled "JANEDAD.JPG" on September 19, 1996 at 12:48:00 PM eastern daylight time. This file also allegedly was sent to Blonde1024.

Count nine charges Defendant with transmitting a graphic file titled "09NI-COLE.JPG" on September 19, 1996 at 13:18:32 PM eastern daylight time. Count ten charges Defendant with transmitting a file titled "LL–C2–16.JPG" on September 19, 1996 at 13:19:04 PM eastern daylight time. Both of these graphic files were allegedly sent to Blonde1024.

Defendant argues that the four counts arise from only two acts, and that the two excess counts of the indictment violate the Double Jeopardy Clause's protection against multiple prosecutions for the same crime. *See Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (man who transported two women across state line in a single trip only committed a single violation because statute did not clearly state that a person could be charged separately for each woman transported). In *U.S. v. Gallardo,* 915 F.2d 149, 151 (5th Cir.1990), *cert. denied,* 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991), the Fifth Circuit held that it is the act of transporting images that is the focus of 18 U.S.C. § 2252. As a result, that court held that a defendant who mailed three separate envelopes of child pornography committed three separate violations because the mailing of each envelope was a separate act of transportation. *See id.* at 151.

Defendant argues that *Gallardo* is distinguishable because of the difference between e–mail and traditional mail. Defendant al-leges that the pictures at issue in these four counts were transmitted as attachments to four e–mail transmissions, but that the transmissions were part of only two "conversations" on-line.[1] Defendant argues that each of these two "conversations" constitutes a single use of the telephone wire, regardless of the number of transmissions made during the conversation.

██ Assuming Defendant's factual allegations are correct, the Court disagrees with Defendant's factual distinction and instead believes that a single e–mail transmission is analogous to a single envelope placed in a mailbox. When a person attaches child pornography to an e–mail message and sends it through the phone wire, that person has just transported child pornography. If the person decides to send another message a minute later and attaches another picture, that is a separate act of transportation, regardless of the brief interval of time between transmissions and regardless of whether the transmissions are part of a single "conversation." Because the statute focuses on acts of transportation, the Defendant may be charged with a separate count for each e–mail transmission.

### II. Mens Rea Requirement of § 2252

The Defendant moves to dismiss the indictment in its entirety, arguing that § 2252 is unconstitutional because it fails to include a mens rea requirement. However, Defendant concedes that to be convicted under the statute, § 2252(a)(1) explicitly requires that the defendant *knowingly* transport or ship the visual depiction, and that § 2252(a)(2) explicitly requires that the defendant *knowingly* receive or distribute the visual depiction. Defendant also concedes that the Supreme Court has extended the "knowing" requirement to § 2252(a)(1)(A) and (a)(2)(A), requiring that the defendant also must know the sexually explicit nature of the depictions as well as the age of the performers depicted. *See U.S. v. X–Citement Video, Inc.,* 513 U.S. 64, 78, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). Defendant's argument, therefore, is that

---

**1.** Counts seven and eight concern transmissions that allegedly occurred within seven minutes of each other, and counts nine and ten concern transmissions that allegedly occurred within one minute of each other.

some level of criminal intent is required above and beyond the "knowing" requirement of § 2252.

■ The Court believes that the "knowing" requirement is a sufficient level of mens rea. The Supreme Court's reading of the statute in *X–Citement Video* was motivated, at least in part, by constitutional concerns. In supporting its interpretation of the knowledge requirement, the Court not only cited First Amendment caselaw, but it also cited the mens rea cases that Defendant relies on here. *See X–Citement Video*, 513 U.S. at 70–71, 115 S.Ct. 464 (citing, among others, *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952)). Defendant is correct in stating that the Court did not explicitly consider whether § 2252 was constitutional *after* its interpretation of the knowledge requirement. But the Court's analysis does suggest that it expanded the knowledge requirement in order to satisfy constitutional concerns. In addition, *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), persuades the Court that knowledge is a sufficient standard of mens rea. In that case the Supreme Court, after deciding that intent is an element of a criminal antitrust prosecution, proceeded to select "knowledge" as the appropriate standard of intent. *See id.* at 444–46, 98 S.Ct. 2864.

■ Although it is made within the context of his constitutional argument, Defendant also suggests that the Court should read a greater level of mens rea into the statute as a matter of congressional intent. Defendant's contention is that Congress could not have meant to criminalize activities of journalists because it relied on the work of researchers and journalists in passing the law. *See* Mem. in Supp. of Def.'s Mot. to Dismiss at 13–14. This piece of legislative history cannot, however, overcome the plain language of the statute, which only requires that the Defendant knowingly transport or receive child pornography. The severity of the statute is not surprising when one considers that one of the few ways to attack the source of the child exploitation is to "dry up the market" and eliminate the demand for the images. *See New York v. Ferber*, 458 U.S. 747, 760, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

Because knowledge is a sufficient mens rea standard, and because the plain language of the statute prevents any speculation as to whether Congress intended a higher standard of intent, the Court will not grant Defendant's motion to dismiss on this ground.

III. *Constitutionality of Statute as Applied to a Reporter*

The Defendant also moves to dismiss the complaint on the grounds that it is unconstitutional as applied to a journalist's news gathering activities. The Government has stated clearly that it does not believe that Defendant's activities were part of his work as a reporter, and argues that it has evidence to support its contention. Because of the Government's position, a jury would have to decide the reason why the Defendant might have committed these acts. However, the Government also argues that the First Amendment provides no defense to the charges even if the Defendant was acting as a journalist. Accordingly, the Government has filed a motion *in limine*, asking the Court to exclude any evidence, testimony, or argument concerning Defendant's alleged journalistic motive. The question for the Court, therefore, is whether Defendant enjoys a First Amendment defense that can be presented to the jury.

The Court's analysis begins with *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). In *Ferber*, the Supreme Court upheld the constitutionality of a New York statute which banned distribution of non-obscene child pornography. The Court found that the state's interest in safeguarding minors not only is a sufficiently compelling state interest, but that it is of "surpassing importance." *See id.* at 756–57, 102 S.Ct. 3348. The legislative judgment that children are seriously harmed when used as pornographic subjects "easily passes muster under the First Amendment." *Id.* at 758, 102 S.Ct. 3348. The Court also found that the distribution of child pornography is "intrinsically related" to the sexual abuse targeted by the legislature. *See id.* at 759, 102 S.Ct. 3348. The image itself is a "perma-

nent record" of the child's participation in the act, and the harm to the child is exacerbated as the image is circulated. *Id.* In addition, the Court recognized that the imposition of severe sentences on those who distribute child pornography may be the only way to curtail the industry in light of the difficulty in reaching the clandestine producers themselves. *Id.* at 759–60, 102 S.Ct. 3348.

Defendant's "as applied" challenge in this case arises from the manner in which the *Ferber* Court considered whether the New York law was unconstitutionally overbroad. The New York Court of Appeals had found the statute unconstitutional, in part, because it could reach "some protected expression, ranging from medical textbooks to pictorials in the National Geographic." *See id.* at 773, 102 S.Ct. 3348. The Supreme Court rejected the overbreadth attack, doubting that "these arguably impermissible applications of the statute amount to more than a tiny fraction of the materials within the statute's reach." *Id.* The Court instructed that potentially unconstitutional applications of the law should be addressed on a " 'case-by-case' " basis. *See id.* at 773–74, 102 S.Ct. 3348 (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615–16, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

*Ferber* does not explain exactly which applications of the child pornography law would implicate speech protected by the First Amendment. Justice White's reference to pictures in "medical textbooks" and "pictorials in the National Geographic" suggests that the content of the pictures themselves, and perhaps the context in which they are displayed, determines whether they are protected by the First Amendment. Justice O'Connor, concurring, expressed a concern about the same types of material, mentioning "clinical pictures of adolescent sexuality, such as those that might appear in medical textbooks" and "pictures of children engaged in

rites widely approved by their cultures, such as those that might appear in issues of the National Geographic." *See id.* at 775, 102 S.Ct. 3348 (O'Connor, J., concurring). Justice Brennan, with whom Justice Marshall joined, also seems to have been concerned about pictures whose content classifies them as protected speech. Justice Brennan expressed his view that any application of the statute to "depictions of children that in themselves do have serious literary, artistic, scientific, or medical value, would violate the First Amendment." *See id.* at 776, 102 S.Ct. 3348 (Brennan, J., concurring in the judgment). The opinion providing Defendant with the most support is that of Justice Stevens, who wrote that there may be constitutionally protected *uses* of child pornography. *See id.* at 778, 102 S.Ct. 3348 (Stevens, J., concurring in the judgment). Justice Stevens suggested that a viewing of the film before a legislative committee or before a group of research scientists could not constitute a criminal act. *See id.*[2]

■ Defendant does not principally rely on the First Amendment's protection of speech, and Defendant has not argued that he intended to use the pictures in a context that would give them serious literary, artistic, scientific, or medical value. Instead, Defendant argues that his use of the pictures is protected by the First Amendment's protection of the press. The only manner in which Defendant's argument implicates free speech is that the public's ability to express themselves depends on the press's ability to inform. Defendant has relied not on free speech cases, but on cases concerning the First Amendment's protection of news gathering activities. As a result, the Court must turn to those cases addressing the First Amendment's protection of the press from laws of general application.[3]

---

**2.** In support of his argument that there must be an exception to § 2252, the Defendant notes that, after *Ferber,* Congress considered amending the statute to include an affirmative defense for cases involving serious literary, artistic, or scientific value. In *United States v. Lamb,* 945 F.Supp. 441 (N.D.N.Y.1996), the Court noted that the Department of Justice recommended to Congress that a defense was unnecessary, suggesting that defendants may raise constitutional objections if a case falls within the small number of materials

receiving constitutional protection. See *id.* at 449 (citing H.R.Rep. No. 98–536 at 13 (1983), reprinted in 1984 U.S.C.C.A.N. 492, 504). This Court reads the legislative history as meaning that Congress, at most, intended the statute to include a defense only to the extent one is required by the Constitution.

**3.** The Court is not aware of any other Courts specifically considering this issue in the context

■ The First Amendment protects the public's right to a free press charged with the responsibility of informing the community of matters of public importance. *See Branzburg v. Hayes,* 408 U.S. 665, 726–27, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (Stewart, J., dissenting); *New York Times Co. v. United States,* 403 U.S. 713, 717, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (Black, J., concurring); *Thornhill v. Alabama,* 310 U.S. 88, 95, 101–02, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Because the right to a free press would be worthless without some protection for the press's ability to seek out the news, the Supreme Court has recognized that the First Amendment also protects news gathering activities. *See Branzburg,* 408 U.S. at 681, 92 S.Ct. 2646.

■ But the First Amendment's protection of the press is far from unlimited. It is well-settled that the First Amendment does not grant the press automatic relief from laws of general application. *See Cohen v. Cowles Media Co.,* 501 U.S. 663, 669–70, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991); *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 576–79, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (press must obey copyright laws); *Branzburg,* 408 U.S. at 682–83, 92 S.Ct. 2646 (citing decisions refusing to exempt news organizations from National Labor Relations Act, Fair Labor Standards Act, Sherman Act, and laws of general taxation). Most relevant to this case, the First Amendment's protection of news gathering activity does not guarantee the press special access to information not available to the general public, *see Branzburg,* 408 U.S. at 684, 92 S.Ct. 2646 (citing cases), nor does it grant the press a right to travel to restricted locations in the search for news, *see Zemel v. Rusk,* 381 U.S. 1, 16–17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information."), nor does it grant the press a right to break and enter a home or office in a search for news. *See Cohen v. Cowles Media. Co.,* 501 U.S. at 669, 111 S.Ct. 2513.

18 U.S.C. § 2252 prohibits any member of the general public from knowingly receiving or transporting child pornography in interstate commerce. In this regard, it is a law that limits the public's access to specific material, and the question posed is whether the First Amendment requires that the Defendant be granted relief from this general prohibition if he violated the law during news gathering activity.

■ Supreme Court precedent demonstrates that the Court must balance the competing interests involved in this particular case. In *Branzburg,* the Supreme Court declined to create a testimonial privilege protecting reporters from having to testify before a grand jury. *See id.* at 690, 92 S.Ct. 2646. The Court examined both the expected burden on news gathering and the important role of the grand jury in effective law enforcement, and concluded that the public's interest in law enforcement was sufficient to override the burden imposed. *See id.* at 690–91, 695, 92 S.Ct. 2646; *see also id.* at 710, 92 S.Ct. 2646 (Powell, J., concurring) (discussing balance between freedom of the

---

of journalistic activity. Other courts have allowed a defendant to argue that his use of the pornography was part of research activities and therefore fell within the scope of constitutionally protected speech. A district court in Maine apparently allowed a defendant to argue that he used child pornography as research for a book in progress. *See* Nancy Garland, Abuse Claim Arises in Porn Trial, Defendant Says Early Rape Led Him to Research Child Exploitation, Bangor Daily News, September 19, 1997, 1997 WL 11882538. The Court is not aware of any published decisions from this case. In *Stanley v. United States,* 932 F.Supp. 418 (E.D.N.Y.1996), the Court considered whether certain pictures were subject to the civil forfeiture provisions of § 2254. The Court held that even if there is a literary, scientific, or educational exception, the Defendant did not qualify because he was not a bona fide researcher. *See id.* at 421–22. The Court referenced an unpublished decision from the Western District of Washington, but this Court has not been provided with that decision. Finally, in *United States v. Lamb,* 945 F.Supp. 441 (N.D.N.Y.1996), the Court rejected an argument that the statute is unconstitutionally overbroad. However the Court concluded that the Defendant was entitled to argue that he possessed child pornography to facilitate his research as a psychiatrist. *See id.* at 450. The Court reserved the issue for trial when it would be resolved by the factfinder. *See id.* All of these cases focused on the First Amendment's free speech protection, not the First Amendment's protection of the press.

press and obligation of citizens to give relevant testimony about criminal conduct); *id.* at 734–35, 92 S.Ct. 2646 (Stewart, J., dissenting) (must examine competing interests in determining whether there is an unconstitutional infringement). In *Cohen v. Cowles Media Co.*, 501 U.S. at 671–72, 111 S.Ct. 2513, the Supreme Court reasoned that while allowing a newspaper to be sued for breach of contract/breach of promise might inhibited the press in its quest to publish newsworthy information, such inhibition would be "incidental" and "constitutionally insignificant." The dissenting Justices believed, in part, that the effect would be greater and that a different balance should be struck. *See id.* at 675–76, 111 S.Ct. 2513 (Blackmun, J., dissenting); *id.* at 677–79, 111 S.Ct. 2513 (Souter, J., dissenting). Similarly, the Fourth Circuit has compelled reporters to testify at a criminal trial when the particular circumstances of the case indicated an incidental burden on the press. *See In re Shain*, 978 F.2d 850, 852–54 (4th Cir.1992) (citing *Branzburg* ).

Defendant argues that the balance must be struck in favor of the press because of his overriding need to access child pornography on the Internet. Defendant first relies on his contention that he was investigating the role of law enforcement officials on the Internet. *Amici* support Defendant's contention by arguing that law enforcement agencies historically have misunderstood the Internet and are usually either indifferent or overzealous in their prosecutions. *See* Brief of *Amici Curiae* ACLU of Maryland and ACLU of Nat'l Capital Area in Opp. to Gov't's Mot. in Lim. at 9–11. Although the Court agrees that the press cannot rely on the government ·to disclose its own wrongdoing, it fails to see how this leads to the conclusion that the Defendant has a compelling need to transmit and receive child pornography. If law enforcement officials are doing something improper in their investigations, the Court does not understand how Defendant would uncover that malfeasance by receiving and disseminating the material himself.

Defendant also suggests that the public has a right to know whether the government is doing enough to curtail the availability of child pornography on the Internet. Again, the Defendant has not explained how his own transportation of the material would further this investigation. Surely there are other ways of determining the amount of child pornography available on the Internet and whether the images are easy to obtain. While the Court is hesitant to give news gathering tips, the Court agrees with the Government that other, legal avenues of investigation are available. For example, a reporter could study the number of prosecutions brought by the government and examine the public records in those cases. A reporter could develop sources, including victims of child pornography and people already convicted of violations. Finally, a reporter could examine reports to public interest groups that track incidents of child pornography distribution.[4] *See* Gov't's Resp. to Def.'s Mot. to Dismiss and Gov't's Mot. in Limine at 15–16. The Court is sure that a seasoned reporter could think of other resources that would not require that the reporter depend on the government for information. Even if these resources did not provide the entire picture, they would give at least as much insight into the scope of the problem as the reporter's own transactions on his home computer.

Even assuming that Defendant's "exploration" would in some way advance his investigation, the degree to which a reporter gains knowledge about the general subject matter by committing his own violations is insignificant compared to the government's interest in preventing the exploitation of children. One must keep in mind that the Defendant's receipt and dissemination of the pornography is the exact harm identified in *Ferber* as contributing to the sexual exploitation of children. *See Ferber*, 458 U.S. at 759–60, 102 S.Ct. 3348. In comparison, Defendant's minimal interests in obtaining his own child pornography does not strike the Court as being nearly as important as the journalist's interest in confidential sources considered in

---

**4.** *See* For the Record, Washington Post, May 1, 1998 at A14 (discussing website of National Center for Missing and Exploited Children).

*Branzburg.* And the magnitude of the government's interest in this case is truly striking when compared to the less compelling interest justifying a restriction on a reporter's foreign travel. *See Zemel,* 381 U.S. at 14–17, 85 S.Ct. 1271. Nor does the Court agree with *Amici* that the government's interest is reduced because the reporter asserts that he actually was assisting the F.B.I. *See* Brief of *Amici Curiae* ACLU of Maryland and ACLU of Nat'l Capital Area in Opp. to Gov't's Mot. in Lim. at 15. Any assistance that he might have provided is greatly outweighed by the harm done by Defendant's transportation and dissemination of the images. It is Defendant's actions which contribute to very problem that he wanted to investigate.

Finally, *Amici* point to the anonymous nature of on-line communication, and argue that a reporter cannot "take the word of someone in a chat room that he or she has child pornography to sell or trade." *See id.* at 11–13. The Court does not believe that the only way a reporter can confirm that pornography is available on the Internet is to obtain and distribute the images himself. Any person, reporter or otherwise, who wants to know whether child pornography is available on the Internet is free to come to federal court and observe a prosecution for a § 2252 violation. That person will quickly learn that there are people trading child pornography over the Internet.

Defendant is justified in noting that Congress may never have passed this very law had journalists not exposed the widespread availability of child pornography. But the Court does not believe that a reporter must traffic in child pornography to reveal its availability to the public. The Court understands that the availability of the material over the Internet may not be an easy matter to explore. However, it does not seem substantially different from other means of distribution, such as mail received from overseas providers. There must be other, admittedly more labor-intensive means of reporting this story. In sum, the Court

does not agree that its ruling will prevent journalists from informing the public about the existence of child pornography on the Internet.[5]

### IV. *Trial Procedure*

For the reasons stated in Section III, the Court will deny Defendant's motion to dismiss and will grant the Government's motion *in limine.* A hearing is scheduled for June 30, 1998. The Court will discuss with counsel the manner in which the Defendant's presentation will be limited. The Court also needs to discuss with counsel the proper jury instructions, as well as the other motion in limine.

### *Conclusion*

Defendant has argued that he should be allowed to receive and distribute child pornography in order to gather news for a future story. However, the law is clear that a press pass is not a license to break the law. Because of the government's surpassing interest in protecting children from the harm caused by the spread of child pornography, and because of the Defendant's minimal interests in obtaining and transmitting the images himself, the Court will deny both motions to dismiss and will grant the Government's motion *in limine.* An order consistent with this opinion will follow.

### *ORDER*

Pursuant to the memorandum opinion, it is this 29th day of June, 1998, hereby ORDERED:

1. That the Defendant's motion to dismiss counts eight and ten of the indictment [8–1] BE, and the same hereby IS, DENIED;

2. That the Defendant's motion to dismiss [13–1] BE, and the same hereby IS, DENIED;

3. That the Government's motion *in limine* [15–2] BE, and the same hereby IS, GRANTED, and

---

**5.** The Defendant has argued that the Government's position in this case would mean that law enforcement officials could not transmit or receive child pornography without violating the statute. Immunity enjoyed by law enforcement officials is a topic briefly mentioned by the district court in *Lamb,* 945 F.Supp. at 448–49, 450, and is not before the Court in this case.

4. That the Clerk of the Court mail copies of this order and memorandum opinion to all counsel of record.

## MEMORANDUM OPINION

On June 29, 1998, the Court denied the Defendant's two motions to dismiss, and granted the government's motion *in limine*. On June 30, 1998, the Defendant filed a motion for reconsideration of the Court's ruling on the motion *in limine*. As discussed at the hearing held on June 30, 1998, the Government has responded to the motion in an expedited fashion. For the reasons set forth below, the motion for reconsideration will be denied.

The facts of the case were explained in detail in the memorandum opinion dated June 29, 1998 and will not be repeated here. It is sufficient to state that this case involves a reporter who is accused of sending and receiving child pornography in violation of 18 U.S.C. § 2252. The prior opinion, in granting the Government's motion *in limine*, forbade the Defendant from arguing to the jury that it may find him not guilty if it were to find that his acts were committed as part of news gathering activity.

In ruling on the motion, the Court stated that "Defendant does not principally rely on the First Amendment's protection of speech, and Defendant has not argued that he intended to use the pictures in a context that would give them serious literary, artistic, scientific, or medical value." *See* Memorandum Opinion at 8. In his motion to reconsider, Defendant argues that he did rely on free speech caselaw, and that it is both the free speech clause and the free press clause which provide him with a defense. Therefore, the Court must clarify why it believes that the free speech clause does not provide a defense to these charges.

As was stated in the memorandum opinion, the Court's analysis must begin with *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). In that case the Supreme Court held that non-obscene child pornography is not speech protected by the First Amendment. *See id.* at 754–64, 102 S.Ct. 3348. In rejecting an overbreadth attack, the Court stated that there are "argu-

ably impermissible applications of the statute," but that they did not amount to more than "a tiny fraction of the materials within the statute's reach." *See id.* at 773, 102 S.Ct. 3348. The Justices cited examples of materials that could receive constitutional protection, such as "medical textbooks" and "pictorials in the National Geographic." *See id.* at 773, 102 S.Ct. 3348; *see also id.* at 775, 102 S.Ct. 3348 (O'Connor, J., concurring).

Defendant has not argued that the images he is alleged to have received and transmitted are the type of images protected by the First Amendment. Instead, Defendant argues that he is protected by the First Amendment if he used the pictures as a means of researching a story. The Court does not agree.

■ In *Ferber*, the Supreme Court held that child pornography is not protected by the First Amendment because of the immense harm it causes to children. *See id.* at 756–64, 102 S.Ct. 3348. In noting that there may be some unconstitutional applications of the statute, this Court believes that the Supreme Court was contemplating depictions which technically fall within a statute's definition of child pornography but do not cause the harms that motivated the legislation. The examples given in *Ferber*, medical textbooks and the National Geographic, contain depictions whose production and dissemination does not involve the sexual exploitation of children. In contrast, the Court does not believe that the First Amendment protects pictures that are undisputably hardcore child pornography, even if the pictures are used in an arguably productive manner. Because the production and dissemination of the pictures involves the sexual exploitation of children, even well-intended uses of the images are unprotected.

The conclusion that the First Amendment only protects speech whose content and distribution does not exploit children finds support in *Ferber*, which held that the New York statute defined a "category of material the production and *distribution* of which is not entitled to First Amendment protection." *See id.* at 765, 102 S.Ct. 3348 (emphasis added); *see also Osborne v. Ohio*, 495 U.S.

103, 140, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (Brennan, J., dissenting) (*Ferber* did not authorize a ban on possession of the material in one's own home, but merely placed child pornography in a category of material whose "production and *distribution* could be proscribed" (emphasis added)).

Justice White explained in *Ferber* that "a work which, taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography." *Ferber,* 458 U.S. at 761, 102 S.Ct. 3348. Justice White then quoted a New York assemblyman who had said that " '[i]t is irrelevant to the child [who has been abused] whether or not the material ... has a literary, artistic, political or social value.' " *Id.* at 761, 102 S.Ct. 3348 (citing memorandum). Justice O'Connor stated that the statute could be overbroad because it reaches "*depictions* that *do not actually threaten the harms identified by the Court.*" *See id.* at 775, 102 S.Ct. 3348 (O'Connor, J., concurring) (emphasis added). *See also id.* at 776, 102 S.Ct. 3348 (Brennan, J., concurring) (application of the law to "*depictions* of children that *in themselves* do have serious literary, artistic, scientific, or medical value" would violate First Amendment (emphasis added)).

■ In short, the Court does not believe that the First Amendment provides a defense when the production and dissemination of the pictures at issue causes the overwhelming harm to children identified by the Supreme Court in *Ferber.* *But see id.* at 778, 102 S.Ct. 3348 (Stevens, J., concurring in judgment) (display of films before group of research scientists could not be made a crime); *United States v. Lamb,* 945 F.Supp. 441, 450 (N.D.N.Y.1996) (allowing defendant to argue that acts were committed in furtherance of legitimate research). The pictures at issue in this case are the very types of pictures that the Supreme Court identified as not protected by the First Amendment. Because the Court does not believe that the Defendant is entitled to a First Amendment defense concerning his alleged proper motivation in using the pictures, the motion for reconsideration will be denied. In addition, to the extent that Section II of the motion for reconsideration asks the Court to reconsider Defendant's argument concerning his need as a reporter to conduct these activities, the Court declines to do so and relies on the reasoning of the prior memorandum opinion. An order consistent with this memorandum opinion will follow.

### *ORDER*

Pursuant to the memorandum opinion, it is this 2nd day of July, 1998, hereby ORDERED:

1. That the Defendant's motion for reconsideration BE, and the same hereby IS, DENIED;

2. That the Clerk of the Court mail copies of this order and memorandum opinion to all counsel of record.